# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

________________________________

BRIAN CLARK, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

VIA RENEWABLES, INC., F/K/A SPARK ENERGY, INC.,

Defendant.

Case No. 3:24-cv-00568-JSC

________________________________

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE FOR VIA RENEWABLES, INC. - JULIO ASTORGA

DATE: Tuesday, August 20, 2024

TIME: 9:04 a.m.

LOCATION: Remote Proceeding
Houston, TX 77080

OFFICIATED BY: Eduwiges Lastra Sanchez

JOB NO.: 6854618

just a -- a list of -- of leads; right? The -- the calls that we're making are in response to kind of a -- a direct opt-in for contact.

Q Okay. For these calls, for the direct opt-in, does Spark use a prerecorded message to make those calls?

A So I can say no. Spark -- Spark is not leaving any sort of prerecorded messages for calls.

Q Okay. So for these calls only, we're talking about your outbound in response to a direct opt-in, that would just be a hand-dialed, called from one of your team members?

A Not necessarily. I mean, so -- so I guess there's -- there's kind of a distinction here; right? Like, the -- the agents, like, one of my teams is my internal sales team. For them, I control the dialer. We control the -- the list of leads. I can clearly tell you that we're not leaving any sort of prerecorded call, for sure.

Q Okay. The list of leads, where do you receive that from?

A So we purchase leads from a variety of different sources. There are different vendors and publishers that we have contracted with to purchase these -- these opt-in leads.

Q Okay. So in that circumstance, the lead vendor would state, "I have," you know, "an X number of people who are interested in receiving a call," and they would give you a list or the phone numbers to call?

MR. TROUTMAN: Vague.

A No. I don't believe that's how it operates.

Q Okay. So can you kind of walk me through how it operates getting the leads from the lead vendors?

A So I can't really speak to what happens on the vendor's end and how they're presenting the form. I can tell you that I purchase data from them that comes from their web assets and the form that's completed online. Then the -- the information gets sent to my active prospect lead conduit account, along with a Trusted Form Certificate. And that's how I come into possession of the lead information.

Q Okay. So for all of these leads that you're doing your, you know, direct opt-in dialing, you will have a form for each person that was called?

A That is the intent, yes, is to -- is to capture that Trusted Form Certificate for every single lead that we purchase? Yes.

Q Okay. And do you always have that form before you make a call?

A That I don't know.

Q Okay. And I assume that on the form, it would say there's some kind of consent to make the call?

A The form, the certificate that is provided to me, includes some metadata about the transaction. So the customer name, the time date stamp, IP address. The actual session replay of the opt-in session is something that's also available through that.

Q Okay. Does it have information about whether the person's number on the Do Not Call list?

A I -- I don't know.

Q Okay. I'm going to show you something. Hold on. Let me do this real quick. I'm going to show you a document, and we're not going to go over it too much right this moment. But I want to see if it's what we're talking about. So give me one second.

All right. Do you see this document?

A Nothing yet, it's just black.

Q Let me try again. Okay. All right. How about now?

A Yes. Now, I can see it.

Q Okay. So take a look at this document. We're going to mark this as Exhibit 2 to the deposition.

(Exhibit 2 was marked for identification.)

Is this the type of lead document you're

EXAMINATION

BY MR. PRATO:

Q So Spark Energy provided my client's phone number to Energy BPO then; correct?

A That is correct.

Q Okay. And you stated that Spark Energy received that phone number through your conduit?

A Correct. Active Prospect lead conduit, it's a online software repository for vetting and storing lead usage -- lead -- lead data.

Q Okay. Is that Spark Energy's particular system, or is that something like a general, anybody can use it, type of thing?

A So it is a -- a service that's available for anybody. We have a contract with Active Prospect and we, you know, pay them a service fee for -- for handling the lead data for us.

Q Okay. And did you discuss with anybody from the conduit how they got my client's phone number?

A No. I -- I wouldn't have had any communication with them about that. They're just kind of a service layer. They -- they just kind of receive and transmit data.

Q All right. Okay. Did they send you a copy of any kind of consent with my client's phone number on it?

A I'm -- I -- I'm not sure of the exact technology, but it would look like a video replay.
Q Okay. And it would purport to show my client using some kind of website and entering his phone number and asking for information on Energy?
A It -- it would have information of, yeah, a session replay of the customer going through and, like, filling out the registration form.
Q At any point, did Spark Energy run my client's phone number through the Do Not Call registry?
MR. TROUTMAN: Asked and answered.
A Yeah. I -- I do not know.
Q Does Spark typically provide the phone numbers to Energy BPO to call?
A Yes, typically, we provide the leads that they are dialing.
Q Okay. Is that exclusively Spark provides the leads, or is it just one of the ways?
A I don't know. I would've to double check.
Q But my client's situation is not unique in that his number was on this lead list, and then, provided to Energy BPO; correct?
MR. TROUTMAN: Misstates the facts.
Go ahead.
THE WITNESS: The -- the path through

which we obtained the lead, and then, provided it to EBPO is -- is not unique. No.

MR. PRATO: Okay. Okay. Now, I have no further questions. Do you have anything else?

MR. TROUTMAN: Nothing further.

MR. PRATO: Okay. So I'm going to relieve the court reporter of her duties.

So like I told you earlier, Mr. Astorga, you're going to receive a copy of the deposition transcript to review. Go ahead and make a review. On the very back set of pages, there'll be lined pages. So what you would do is, if you want to make a change, you write down the line, what it says, and then, what you want to change it to on those. So that's where we keep track of the changes. You don't actually scribble on the transcript; okay? So go ahead and look at that. And when you've reviewed it and you're happy with it, go ahead and sign it and provide it to your counsel. So the transcript's going to go to your counsel, and then, he'll provide it to you.

I typically do 30 days. Is that plenty of time to review the transcript?

MR. TROUTMAN: Yeah, that works. And we're not going to, at this point, we're not going to designate the transcript confidential. But we'll take a