# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN CLARK, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

VIA RENEWABLES, INC, F/K/A SPARK ENERGY, INC.,

Defendants.

Case No. 3:24-cv-00568-JSC

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF BRIAN CLARK

TUESDAY, OCTOBER 29, 2024, 10:10 A.M.

Reported by: Terri L. Emery, CSR No. 11598
Job No. 103453

communication privilege. Don't relate any of our conversations or any documents I may have shown you, but otherwise answer the question.

**THE WITNESS: Okay. I went back to my notes about the calls for this case and just, you know, reviewed what I did after each call.**

BY MR. TROUTMAN:

Q. Other than your notes, did you look at anything else?

MR. REICHMAN: Same objection. Go ahead and answer with the limitation.

**THE WITNESS: I don't think so.**

BY MR. TROUTMAN:

Q. The purpose of you reviewing your notes was to refresh your recollection. Was that correct?

**A. Yep.**

Q. Do you have those notes with you today?

**A. I do not.**

Q. Where are those notes?

**A. At home on my computer.**

Q. Oh, they're computerized notes?

**A. Yes.**

Q. They're not written notes?

**A. Correct.**

Q. Do you have any written notes?

**A. No, I enter them in a computer as, you know, kind of like a log or a journal or whatever.**

Q. Other than the notes regarding the calls from Via Renewables, do you have notes regarding any other phone calls you've received?

**A. I probably have --**

MR. REICHMAN: Objection. Relevance. Please continue your answer.

**THE WITNESS: If I think it's not some call center in India, you know, trying to scam me out of my credit card number, you know, if I think it's actually a company here, I might, you know, keep a note just because like, for example, when Spark first called, I thought it was an Indian scam to be honest.**

BY MR. TROUTMAN:

Q. When did you start taking notes regarding phone calls you received?

**A. For this case or in general?**

Q. In general.

**A. Late '90s.**

Q. Have you been keeping notes of phone calls you received continuously since the late '90s?

MR. REICHMAN: Objection. Misstates prior testimony, but go ahead and answer the question as is.

at 10:32 a.m.
BY MR. TROUTMAN:
Q. Before we went off the record, Mr. Clark, you were telling us that on average, you received one call worth tracking a month, I believe. If you would go ahead and continue with your answer.
**A. Again, it's just a guess because I don't -- you know, it happens every once in a while, I'm like it irritates me, so I'll write it down. Yeah, just what I said, like, you know, time, date, number, so it's not a lot.**
Q. I think you mentioned earlier, and I might have misheard you, that you also made notes on what you were doing or what you did at the time that you received the call. Is that contained in the notes as well or no?
MR. REICHMAN: Objection. Relevance. Go ahead and answer.
**THE WITNESS: What I was doing? Not unless it was -- I don't know why I would include what I was doing.**
BY MR. TROUTMAN:
Q. Have you produced the notes that you're referring to in this case?
**A. Have I produced them?**

Q. Yes. Have they been provided to Via Renewables?

**A. No.**

Q. Why not?

**A. They're my notes.**

Q. Are you refusing to produce your notes in this case, Mr. Clark?

**A. I never thought about giving it to them. It's never been a question until now.**

Q. We'll go through some of the requests for production here and we'll see if that's true, but Mr. Clark, if -- and I am now asking you to produce those notes in this case. Are you willing to do that?

**A. Okay.**

Q. I'm sorry. Is that a yes?

**A. Yes.**

Q. All right. Thank you. We will continue forward with the examination today. We'll reserve the right to continue the examination until we've had a chance to review the notes. We won't necessarily do that, but we'll take a look --

MR. REICHMAN: The notes actually were --

MR. TROUTMAN: What's that?

MR. REICHMAN: The notes were produced.

they stopped. And you know, this isn't going to completely stop things, but -- and my understanding of the TCPA is that Congress couldn't step in in every single phone call, so they put that there so that people could on their own say stop. So no, I don't feel I have a legal mandate to do it, but for my own peace of mind I feel like I have to do something.

BY MR. TROUTMAN:

Q. The three times you called back the numbers that called you, did you ask them to stop calling?

MR. REICHMAN: Objection. Relevance. Go ahead and answer.

THE WITNESS: The first time I called back, the guy asked me if I have PG&E. I said no because I wanted to see what would happen. What happened is he said oh, I can't help you and he hung up on me. So no, I didn't get the chance to. Second time I called back, the -- the person said okay, well, let me get your PG&E account number.

THE VIDEOGRAPHER: You're brushing --

THE WITNESS: Sorry. Oh, me?

MR. TROUTMAN: I apologize.

THE VIDEOGRAPHER: Okay.

THE WITNESS: So okay, let me have the PG&E account number, and so I said yeah, let me get that for

**you, and then I hung up because I was afraid it was a -- a slam situation, I don't know if you know what it is, where you give a company your -- the account number of their competing -- of their -- you give the company your account number, they're a competing company, they take that number and say oh, this person wanted us to switch him, even though you didn't authorize them. So that's what I feared it was, so I hung up.**

BY MR. TROUTMAN:

Q. And the third time?

**A. And the third time I -- the third time it was basically the same situation where we got to that number and I just hung up because I didn't want to give them my account number.**

Q. So all three times you called in, you never asked for the calls to stop. Correct?

MR. REICHMAN: Objection. Relevance. TCPA is opt in, not opt out. Go ahead and answer.

**THE WITNESS: Those would be my words exactly and not because he said them because I don't have to tell them. They use an illegal prerecorded phone call to call me, and when I called them back, by the way, I did not call from my cell phone, I called -- I blocked caller ID and called from work.**

**///**

**I'm pretty sure.**
Q. Earlier you told me that you took notes of telemarketing calls. Do you keep notes of your return calls to company that you -- that you believe were telemarketing you?
**A. If they're something worth writing down, yes, I'll say I called this company, talked to so-and-so, this is what they said.**
Q. Did you make such an entry with regards to your March 23rd, 2023 call to the 888-928-3199 number?
**A. I'm fairly certain I did.**
Q. I'm going to have you look at page 6 of Exhibit 1, paragraph 27. At paragraph 27 you state plaintiff pleads on information and belief that management officials of Spark directed their employees to ignore the national DNC registry and call numbers regardless of whether those numbers were on the national DNC registry or not. What evidence do you have that that took place?
**A. Is this something that we -- attorney-client communication?**
MR. REICHMAN: I was about to make the objection. Yeah. Objection. If you don't testify as to anything that was communicated with you -- to you or

**A. That is correct.**
Q. Thank you.
MR. REICHMAN: Thank you for working with me.
BY MR. TROUTMAN:
Q. The -- the iPhone 16 Pro Max that you currently use, that now has the same phone number that you were using back in March of 2023. Is that correct?
**A. Correct.**
Q. Have you received any calls at issue in this case on the iPhone 16 Pro Max?
**A. No. I mean you're talking -- you're talking about these ten calls?**
Q. Any calls at issue in this case on the iPhone 16 Pro Max.
**A. Unless there are some new ones that I'm unaware of that connect to this case, no.**
Q. All the calls alleged in the complaint at least would have been received on the iPhone 12 phone?
**A. Correct.**
Q. I'm going to show you a document that we'll mark Exhibit 2. It has two pages. Hand you both pages.

(Exhibit 2 marked)

BY MR. TROUTMAN:

Q. First I just want you to take a look at the first page of Exhibit 2. Do you recognize the website layout printed on this page?

**A. No.**

Q. Have you ever been to a website called Best American --

MS. ANDRES: Savings.com.

BY MR. TROUTMAN:

Q. Bestamericansavings.com?

**A. No. I don't think so. I don't recognize it at all.**

Q. You said you don't think so?

**A. No, I've -- I've not.**

Q. You're certain?

**A. I'm certain.**

Q. Best American Savings is a website that allows consumers to sign up to receive offers on various utilities and household goods. I recognize that your testimony here today is that you've never been to this website. Are you aware of anyone who has ever visited this website?

MR. REICHMAN: Objection. Counsel testified as to what Bestamericansavings.com is. You don't have

**A. Yes.**
Q. And in connection with these services, do you recall encountering online submission flows that required you to accept the terms and conditions as a requirement of signing up for this service?
**A. Yes.**
Q. So as you take a look at page 1 of what we've marked Exhibit 2, do you see a register button followed by some fine print with some hyperlinks of a privacy policy and a terms and condition?
**A. Yes.**
Q. Although you've testified that you've never visited this website, is there anything in particular about the format of this website that stands out to you as unique or surprising or that a consumer would not be able to navigate a website like this?
MR. REICHMAN: Objection. Asking for information outside the witness's personal knowledge.
BY MR. TROUTMAN:
Q. Just asking for his --
MR. REICHMAN: To the extent of your ability, go ahead and answer.
**THE WITNESS: Well, from a user experience, it seems like an average website, I suppose.**
///

BY MR. TROUTMAN:
Q. Nothing jumps out at you as -- strike that.
Okay. Take a look at page 2 of Exhibit 1 (sic). I will represent to you this is a screenshot from a third party.
**A. I think they're the same thing.**
Q. Did you not get you the correct page 2? I apologize, sir. There you are. Somehow I mixed up my -- my copies. All right. Do you now have a page 2 of Exhibit 1 --
**A. Yep.**
Q. -- that contains text entered in the register -- enter your information to register page?
**A. I see forms -- boxes filled out on a form, if that's what you're asking.**
Q. Yes. I'll represent to you that is a screenshot taken from a visual rendering supplied by a third party called Jornaya reflecting information that was entered on this form on bestamericansavings.com on March 3rd of 2023. Now, sir, you -- your testimony is you did not enter that information. Is that correct?
**A. Correct.**
Q. You told me earlier your middle name is Sean. Correct?
**A. Correct.**

Q. Spelled S-e-a-n. Is that correct?

**A. Yes.**

Q. You told me earlier that you do not have an iwon.com E-mail address. Is that correct?

**A. Correct.**

Q. All right. So the first name of Briansean would accurately state your first and middle name, the last name Clark indicated on the form would accurately state your last name; however, the E-mail address provided is inaccurate on this page. Is that correct?

MR. REICHMAN: Objection. Misstates the form. Correct in saying it states first name but not middle name. But go ahead and answer to the best of your ability.

**THE WITNESS: Well, this think actually says my name -- first name as Briansean and it's just Brian, so there's no space there, so --**

BY MR. TROUTMAN:

Q. Street address 6425, looks like Girvin Drive. Is that an accurate statement of your real address?

**A. That is -- my address is 6425 Girvin Drive.**

Q. And that was your address on March 3rd of 2023. Is that correct?

**A. Correct.**

Q. And the city of Oakland is where the address is found. Is that correct?

**A. Yes.**

Q. Of course in the state of California. Correct?

**A. Um-hum.**

Q. And the ZIP code 94611. Correct?

**A. Yes.**

Q. The phone number, 510-316-9772, we already established that was your wireless number assigned to your iPhone 12 Pro Max on that date. Correct?

**A. Yes.**

Q. And last, July 19th, 1968? Difficult to read now that the lights are off --

**A. My birthday is '69.**

Q. '69. Is July 19th, 1969, the date on this form, is that -- is that your correct birth date?

**A. My birthday is July 19, 1969. This is hard to read. If that's what you're saying it says, then that's what you're saying it says.**

Q. All right. So assuming for now that the website operator will confirm what the third party Jornaya has already stated, which is this was the information that was provided on the website at the date and time March 3rd, 2023, your testimony is that

somebody else entered accurate information for your name, address, ZIP code, phone number and date of birth and it wasn't you. Correct?

MR. REICHMAN: Objection. Misstates prior testimony. He never testified that anybody else filled out anything, just that he didn't fill it out, but go ahead and answer to the best of your ability the question that was asked.

**THE WITNESS: I did not fill those out.**

BY MR. TROUTMAN:

Q. If somebody filled it out, it wasn't you. Correct?

**A. Correct.**

Q. Any idea how a person would have filled out accurate information that wasn't you?

MR. REICHMAN: Objection. Calls for opinion. Asks for matters outside the deponent's actual knowledge. Go ahead and answer to the best of your ability.

**THE WITNESS: I mean I'm sure I could imagine a lot of scenarios, but it's just a guess.**

BY MR. TROUTMAN:

Q. But you -- you don't know.

**A. I don't know.**

Q. Assuming -- strike that.

testimony is that that you did not accept this agreement to arbitrate at any time?

**A. Correct. I --**

Q. Do you -- do you have any knowledge as to whether or not anybody else who might be in the class agreed to arbitrate?

MR. REICHMAN: Objection. Calls for information outside his own knowledge. Answer only as to your own knowledge.

**THE WITNESS: I have no way of knowing.**

BY MR. TROUTMAN:

Q. I'll provide what we'll mark as Exhibit 9, which is a group of documents some of which are Bates stamped, some of which are not, that goes from P001 through P0024, but as I mentioned, some of them do not have Bates stamp numbers on them. And I will represent to you that this, at least according to my esteemed co-counsel, are the only records that have been produced to us in this case so far. Now, earlier your counsel mentioned that he believed some of the notes had been produced. We don't seem to have a record of those, if they have been produced. Regardless, we're going to serve a separate RFPD to request that production. But for now we'll just --

MR. REICHMAN: No need. If you want them

produced, I'll have them produced.

MR. TROUTMAN: Okay. Let's get those produced, please. I appreciate that.

(Exhibit 9 marked)

BY MR. TROUTMAN:

Q. The first page of Exhibit 9 is just your driver's license. I assume this is an accurate copy of your driver's license, sir?

**A. Yeah.**

Q. The second page is -- actually, what is the second page?

**A. This is -- you go to the national do not call registry and you can say am I signed up, when was I signed up, and this is the thing that they'll send you.**

Q. The date on this exhibit -- page 2 of Exhibit 9 is August 26th, 2019. Is that the date that you requested confirmation from the website?

**A. Probably. I mean sure, within a day I'm sure they send it right back, so yes, it's got to be.**

Q. And then there's a link to click and it says please click on the link below to complete your request to register your phone number ending in 9772. Do you see that?

**A. Um-hum.**

MR. REICHMAN: Don't speculate, please.
BY MR. TROUTMAN:
Q. So is the answer no, you don't know?
**A. I don't know. Not with any certainty.**
Q. Because it looks to my eye, that's the only one that's 15. The rest of them are 13. So it was -- it was just curious to me as to why that would be if it's one at issue which is why I was trying to figure out if it's at issue because there is another Annapolis call that is 13 as you were pointing out. That Annapolis call is 15. I didn't see it expanded, but I mean the record is what the record is.
Okay. And then you provided several recordings, and again, we've already agreed that we're not going to play all those because they were identical, and that was the complete production that we have received to this day.
MR. REICHMAN: Like I said, if the call notes weren't in there, I'll make sure that gets supplemented.
MR. TROUTMAN: All right. And look forward to receiving those.
BY MR. TROUTMAN:
Q. So going back to Exhibit 2, which was the Best American Savings website, I don't want to go

**point.**

Q. So the fact that there doesn't appear to be any outgoing calls in this record, Exhibit 12, indicating a voicemail was being checked would actually be consistent with your understanding of how your voicemail was checked. Is that correct?

MR. REICHMAN: Objection. Assume -- incomplete hypothetical, but to the best of your ability, go ahead and answer.

**THE WITNESS: Yeah, I would not expect it to know when I checked my voicemail because it shouldn't connect to the wireless network, but that's my guess. I --**

BY MR. TROUTMAN:

Q. Brooks Motor Cars, is that a company that you recall calling in March of 2023?

**A. I've called them. I don't know when, but yes.**

Q. Okay. And then you told me you have a Tesla and that contacts with Tesla were to obtain access to your vehicle you were saying?

**A. So if you have a Tesla, you have the app so that you can control the charging and whatever. You can control other functions through the phone. So that's -- I guess I'm not sure what you're asking.**

Q. Well, if you look at page 9 of Exhibit 12, rows 308 down to 330, you'll see a bunch of calls back and forth with the same dialed number, which is this 888-765-2489 number. In fact, you're going to see about 23 of them in the dialed number row or column all in a row. And I'll represent to you that phone number is a Tesla phone number.

**A. Okay.**

Q. And there's calls going out to that Tesla phone number, there's calls coming in from that Tesla phone number, and they're all closely aligned to the date and time of the second call that's at issue in this case. The second call takes place and then all of a sudden there's a bunch of calls back and forth with Tesla. Is -- was my client's -- strike that.

Was the call by Energy BPO on March 6th, 2023 in some way related to your back and forth with Tesla on that same day?

MR. REICHMAN: Objection. Misstates the document. The document shows an out between those calls and the prior call which is the call at issue, but to the extent you're able, answer the question.

**THE WITNESS: There's no relation. I believe at the time I was having trouble with my battery on my house and I was -- judging by the length of the call, I**

**didn't -- I know I called them a bunch of times because I was trying to get through to the right department and Tesla's customer service is terrible. So you have to like -- you have to figure out how to navigate their gateway. So I know I called a lot of times, like oh, this one, nope, that's not it, hang up, redial.**

BY MR. TROUTMAN:

Q. And when you said you had trouble with the battery at your house, you mean the battery in your vehicle while the vehicle was at your home. Is that correct?

**A. No, I have a house battery.**

Q. You have a house battery.

**A. Yeah.**

Q. And the house battery provides electricity?

**A. It stores electricity so then you can use it later.**

Q. So the house battery from Tesla provides electricity to your home?

**A. Right. Well, yeah.**

Q. Is that right?

**A. It holds onto it and then when you needed it.**

Q. And you were having trouble with that battery?

**A. Right.**

Q. What was the trouble?

MR. REICHMAN: Objection. Relevance. But go ahead.

**THE WITNESS: It wasn't charging.**

BY MR. TROUTMAN:

Q. Meaning that there wouldn't be energy in the battery available for when you needed it. Correct?

MR. REICHMAN: Same objection. Go ahead.

**THE WITNESS: Right. It was supposed to charge every day and it was just not charging.**

BY MR. TROUTMAN:

Q. My client provides energy services. Correct?

**A. Correct. I assume. I don't know.**

Q. So is it a coincidence, sir, that we received a form -- strike that.

Is it a coincidence, sir, that my client received a form from someone with your information, looking for information regarding electrical services at the same time that you were having trouble with your Tesla battery at your house?

MR. REICHMAN: Objection. Misstates the document. The document says that -- or the document says the first call was on March 3rd. This says to

Tesla is on March 6th.

BY MR. TROUTMAN:

Q. Is that a coincidence, sir?

MR. REICHMAN: Go ahead.

**THE WITNESS: Yes, that's absolutely a coincidence because I've had the batteries for a while and they were still under warranty and Tesla is electric, not gas.**

BY MR. TROUTMAN:

Q. And to the best of your knowledge, Spark Energy only serves -- provides gas?

**A. Well, that's what the phone call said. It didn't say whether it was electric one way or the other, but they only asked me about gas.**

Q. Have you -- have you looked to see what my client does, Mr. Clark?

**A. Actually, no. I'm not interested.**

Q. My client provides electric services, Mr. Clark.

**A. Okay.**

MR. REICHMAN: You know, objection. To the extent there's a question there, you don't have to take any representation of counsel as being accurate.

BY MR. TROUTMAN:

Q. So -- so let's back up. When did you start

number? That's Tesla again; isn't it, Mr. Clark?
**A. I don't know.**
MR. REICHMAN: Objection.
BY MR. TROUTMAN:
Q. Mr. Clark, you called Tesla regarding your battery in your home on March 1st, 2023; didn't you?
MR. REICHMAN: Objection. You don't need to assume anything in the document or any representation of counsel is accurate. Answer of your own personal knowledge.
**THE WITNESS: I called Tesla to get a battery fixed. I don't know exactly when it was. And I have never even -- you know, why would I assume that these calls from this gas company are coming in because I called Tesla? I -- it doesn't make any sense to me.**
BY MR. TROUTMAN:
Q. Let's take a look, sir, now at lines 277 through 281 on February 27th, 2023. Once again, you see the dialed number 888-762- -- 765-2489. Again, in February -- on February 27, 2023, you called Tesla because of a battery problem at your house. Correct?
MR. REICHMAN: Same objection and instruction as before. You do not have to take any representation of counsel or anything in an unauthenticated document as being accurate. Answer of your own personal

knowledge.

**THE WITNESS: I can't tell you when I called them about the battery. I've also called them about getting it installed, about -- you know, it may have been for my -- getting my car serviced. I can't tell you because it's not the sort of thing you remember oh, yeah, today I'm going to call about the battery but last week it was about the car. You just -- you call the number.**

BY MR. TROUTMAN:

Q. How angry were you about the Tesla battery problem?

**A. I was pretty unhappy but didn't have any options, so something that I just wanted them to fix and fix quickly.**

Q. Well, you did have the option, sir. You had the option to get a new electrical provider; didn't you?

**A. No, I did not.**

Q. How do you figure?

**A. Is Spark Energy going to come and rip the roof off of my house, replace the Tesla solar panels with the Spark solar panels, which I don't even think they build, but maybe they do, apparently you're telling me they do electric, so maybe they do solar**

Q. And what's the E-mail address that you're using?

**A. BC@shout.net.**

Q. BC@shout.net. Okay. And do you title them all the same thing so you can find them later?

**A. The first word will be prerecord.**

Q. Prerecord? And you don't keep notes on anything that's not prerecord?

**A. I generally don't get, you know, an actual person calling me. If it's a legitimate company, I either have an established business relationship with them or it's a scam.**

Q. Okay. So just to be absolutely clear, you'll have to forgive me because I just have to make sure I have this right. The notes that you were talking about earlier, the telemarketing notes that you've been keeping since the '90s are not a Word file, those notes are actually E-mails that you've sent to yourself. Correct?

**A. Lately. In the '90s I would write them down on a -- on a pad of paper.**

Q. At the beginning of the deposition you told me that you looked back at your notes to refresh your recollection. The notes that you looked at were E-mails. Is that correct?

**A. Yes.**
Q. So in order for your counsel to produce your notes, he'd have to review all of the E-mails because those would be the notes. Correct?
**A. I would cut and paste them all into one document if I felt like I wanted to send him this.**
Q. Have you done that yet?
**A. I don't know. I know I did that for getting all the -- well, all these -- for example the DNC registry, those were E-mails which you saw which I cut and pasted. Everything that I gave to him, I would just put it in a file, compile it into one E-mail and send it to him.**
Q. When you're sending yourself one of these notes, is it from your smart phone that you're sending the E-mail or is it from a laptop that you're sending the E-mail?
**A. It's from my laptop because I don't like typing on my smart phone.**
Q. And the laptop is the Mac Pro?
**A. Yes.**
Q. Okay. That's all I need for now. I have no further questions at this time. We reserve the right to reopen once we've seen the notes. Beyond that, I thank you for your time, sir, unless you have any