# EXHIBIT C

TROUTMAN AMIN, LLP
Eric J. Troutman (State Bar # 229263)
Puja Amin (State Bar # 299547)
Brittany A. Andres (State Bar # 340856)
400 Spectrum Center Drive, Suite 1550
Irvine, California 92618
Telephone: +1 949 350 3663
Facsimile: +1 949 203 8689
troutman@troutmanamin.com
amin@troutmanamin.com
brittany@troutmanamin.com

Attorneys for Defendant
VIA RENEWABLES, INC.

TROUTMAN AMIN, LLP
400 Spectrum Center Drive, Suite 1550, Irvine CA 92618
troutman@troutmanamin.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CLARK, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VIA RENEWABLES, INC., F/K/A SPARK ENERGY, INC.,<br><br>Defendants. | Case No. 3:24-cv-00568-JSC<br><br>**DEFENDANT VIA RENEWABLES, INC., F/K/A SPARK ENERGY, INC.'S REBUTTAL EXPERT DISCLOSURE** |

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) and (C), Defendant Via Renewables, Inc., f/k/a Spark Energy, Inc. ("Spark") submits the following expert rebuttal designation:

1. Spark hereby designates the following person to testify at trial under Federal Rules of Evidence 702, 703, and/or 705: Madelyn Moran of Charles River Associates.

TROUTMAN AMIN, LLP
400 Spectrum Center Drive, Suite 1550, Irvine CA 92618
troutman@troutmanamin.com

2. Ms. Moran's Report is attached hereto as **Exhibit "A."** Ms. Moran is a Senior Associate in the Forensic Services practice at Charles River Associates ("CRA"). CRA is a global management consulting and expert services firm that provides independent expert testimony, litigation and regulatory support, financial, economic, and strategic expertise, and data analytics to law firms, Fortune 500 corporations, government agencies, and regulatory bodies. Ms. Moran is expected to provide testimony and opinions regarding the methodology outlined by Plaintiff's Expert, Anya Verkhovskaya. Ms. Moran may also address the opinions of other experts who are retained by Plaintiff or other parties to act as an expert witness, or non-retained expert, in this case.

3. Ms. Moran's Curriculum Vitae ("CV") is attached as **Exhibit "B."** The Report and Ms. Moran's CV contain a complete statement of Ms. Moran's opinions formulated to date; the data or other information considered by her in forming those opinions; the qualifications of Ms. Moran; and the compensation to be paid for the testimony.

4. Spark reserves the right to modify and/or supplement this disclosure and its contents should the subject and nature of Ms. Moran's testimony change in response to the Parties' discovery and investigation efforts which are still ongoing.

5. Spark reserves the right to rely on the testimony of any of Plaintiff's experts and, additionally, reserve any and all rights to retain additional supplemental and rebuttal experts.

Dated: November 15, 2024

TROUTMAN AMIN, LLP

By: */s/Brittany A. Andres*__

Eric J. Troutman
Puja J. Amin
Brittany A. Andres

*Attorneys for Defendant Via Renewables, Inc., f/k/a Spark Energy, Inc.*

TROUTMAN AMIN, LLP
400 Spectrum Center Drive, Suite 1550, Irvine CA 92618
troutman@troutmanamin.com

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRIAN CLARK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIA RENEWABLES, INC, F/K/A SPARK ENERGY, INC.,<br><br>Defendant. | Case No. 3:24-CV-00568-JSC |

# EXPERT REBUTTAL REPORT OF MADELYN MORAN

## I. SUMMARY OF OPINIONS

1. It is my opinion, to a reasonable degree of professional certainty, that the dialer data produced in the instant matter does not allow for the identification of members of the purported class absent an individualized investigation. Further, the methodology outlined by Plaintiff's Expert Anya Verkhovskaya is deeply flawed and impossible to execute because the data she intends to use is incomplete, her analysis does not account for consent to call obtained by Defendant and the third-party data she proposes to pair it with is either unreliable or restricted and her use of it is impermissible. This opinion is based on the following sub-opinions:

### A. **Opinion No. 1:** It Is My Opinion, Based On A Reasonable Degree Of Professional Certainty, That The Purported Class Member Identification Process Suggested By Anya Verkhovskaya In Her Expert Report Dated October 22, 2024, Is Unreliable And There Is No Way, Absent An Individualized Investigation, To Identify Purported Class Members

**B.** **Opinion No. 2:** Ms. Verkhovskaya's Work Contains Clear And Rampant Mistakes Making Her Proposed Methodology Nearly Incomprehensible And Calling Into Question Her Understanding And Use Of Third-Party Vendor Data

**C.** **Opinion No. 3:** Ms. Verkhovskaya Performs No Testing Of Her Proposed Methodology And Her Explanations Of Her Process Lack Specification In Critical Steps That Would Substantially Impact The Size And Composition Of The Purported Class

**D.** **Opinion No. 4:** Ms. Verkhovskaya's Inability To Adequately Test Her Work And Provide A Clear Methodology For Class Identification Is A Serious Concern As She Has Repeatedly Demonstrated She Is Unable To Competently Execute The Type Of Work She Proposes

**E.** **Opinion No. 5:** Ms. Verkhovskaya's Methodology To Subpoena Telecommunications Providers Is Likely Not Feasible Because It Is Dependent On Her Use Of Restricted Data Which She Cannot Access As She Likely Does Not Possess The Required Provider Of Telecom Related Services ("PTRS") Certification And Her Proposed Use of The Data Appears To Be Impermissible

## II. STATEMENT OF QUALIFICATIONS

2. I am Senior Associate in the Forensic Services practice at Charles River Associates ("CRA"). CRA is a global management consulting and expert services firm that provides independent expert testimony, litigation and regulatory support, financial, economic, and strategic expertise, and data analytics to law firms, Fortune 500 corporations, government agencies, and regulatory bodies.[1]

3. I was previously retained as a data analytics expert in *Tobajian v. Allstate Insurance Company*, No. 2:23-cv-00753-DMG-PD, (C.D. Cal.) to provide a declaration and expert testimony pertaining to Telephone Consumer Protection Act-related data analytics in support of settlement. I am currently retained in another three TCPA matters as an expert witness where I have not yet been disclosed.

[1] My most recent Curriculum Vitae is attached as Exhibit 1.

4. In the last nine years, I have been the lead data analyst supporting expert testimony in over 10 consumer class actions alleging violations of the Telephone Consumer Protection Act ("TCPA") or violations of state consumer protection statutes such as the Illinois Biometric Information Privacy Act:

1. *Elliot v. Humana, Inc.*, No. 3:22-cv-329-RGJ (W.D. Ky., Report Filed October 4, 2024)
2. *Usanovic v. eXp Realty, LLC.*, No. 2:23-cv-00687-JLR (W.D. Wash., Report Filed September 9, 2024)
3. *Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc.,* No. 2:22-cv-10830 (E.D. Mich. Report filed May 24, 2024)
4. *Williams v. Pillpack, LLC.*, No. 3:19-cv-05282-DGE (W.D. Wash., Report filed February 26, 2024)
5. *Sabatier v. American Health Reform Solutions, LLC. et al.*, No. 1 :23-cv-22203-RKA (S.D. Fla., Report filed January 9, 2024)
6. *Bayles v. The Hertz Corporation*, No. 1 :22-cv-01092-JRS-MKK (S.D. Ind., Report filed September 25, 2023)
7. *Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al.,* No. 7:22-cv-01052-TMC (S.D.S.C, Report filed February 10, 2023)
8. *Doup v. Van Tuyl Group, LLC et al.*, No. 3:20-CV-02742-x (N.D. Tex., Report filed January 9,2023)
9. *Nightingale v. National Grid USA Service Company, Inc. et al.*, No. 1:19-12341-NMG (D. Mass., Report filed October 2022)
10. *Perrong v. Victory Phones*, No. 2:20-cv-05317 (E.D. Pa., Report filed June 2022)
11. *Vance v. Microsoft Corporation*, No. 2:20-cv-01082-JLR (W.D. Wash.) and *Vance v. Amazon.com, Inc.*, No. 2:20-cv-01084-JLR (W.D. Wash., Report filed December 2021)
12. *Walker v. CRME Financial Services*, No. 3:20-cv-02218-BEN-JLB (S.D. Cal., Report filed December 2021)
13. *Chinitz et al., v. Realogy Holdings Corp.*, No. 3:19-cv-03309-JD (N.D. Cal., Report filed May 2021)
14. *Head v. Citibank, N.A.*, No. 3:18-cv-08189-MHB (D. Ariz., Report filed August 2020)

5. I have degrees in Economics and Political Science from Indiana University, and I have worked as a data scientist and litigation consultant for the past nine years.

6. I work with complex datasets commonly referred to as "Big Data" to inform expert witness testimony in a variety of industries including telecommunications, healthcare, securities, and forensic accounting. I specialize in creating and producing data analytics while providing unbiased and impartial findings pertaining to consumer class actions.

7. I frequently serve as a moderator and speaker at conferences and webinars regarding topics related to the analysis of consumer data, including the analysis of call records in TCPA litigation.

8. I primarily use Microsoft's SQL Server (a relational database management system) to perform analytics related to TCPA consumer class actions, amongst other types of consumer class actions. I have been working in Microsoft's SQL Server Management Studio conducting "Big Data" analytics for the last ten years.

9. I have been retained by counsel for the Defendant Spark Energy and am being compensated at the hourly rate of $535. I have been retained to review the Plaintiff's Expert's Report and the associated data produced and made available to me in this matter to determine whether it can be used to reliably identify members of the purported class.

10. My understanding of the factual matters at issue in this litigation is based on my review of the pleadings, written discovery responses, depositions, other documents produced in discovery.[2] I understand that additional information relevant to my opinions may be disclosed in subsequent reports, document productions, and depositions. I reserve the right to amend my findings based upon additional information.

## III. DOCUMENTS RELIED UPON

11. My understanding of the factual matters at issue is based on my review of the documents and data listed in Exhibit 2 to this report.

[2] Throughout this report, when I use the first person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

## IV. FACTUAL BACKGROUND

### A. Spark Energy

12. Defendant Via Renewables, Inc /f/k/a Spark Energy, Inc. ("Spark") is a Delaware company headquartered in Texas, with one indirectly owned subsidiary providing natural gas to consumers in the state of California.[3]

13. Spark performs outbound marketing through third-party dialing centers only in response to a "direct opt-in for contact."[4] Per the deposition of Spark representative Julio Astorga, Spark does not deploy prerecorded messages in their dialing practices.[5]

### B. BriteBox and Inbounds.com

14. It is my understanding through conversations with Spark and their legal counsel in this case that Spark regularly purchases verified leads through a variety of vendors including but not limited to BriteBox and Inbounds.com.[6] These leads are collected via a webform wherein consumers consent to be called.[7] It is my understanding through conversations with counsel and Spark representatives, that these webforms are available on at least 22 unique websites that may or may not have been active during the proposed class period of January 30, 2020 to present.[8]

[3] This description of Spark Energy is based on my conversations with counsel and Spark Energy representatives surrounding their business practices.
[4] Julio Astorga Depo. Tr. 22:25, 23:1-3.
[5] Julio Astorga Depo. Tr. 23:7-8, 30:7.
[6] Inbounds.com was also previously known as DataProsper.
[7] Julio Astorga Depo. Tr. 24:9-16, 24:20-22.
[8] These websites include, but are not limited to: findresourcesusa.com, freesamplesprousa.com, primerewardspot.com, theamericansweepstakes.com, toprewardspot.com, topsurveyspot.com, trendndaily.com, trendninsider.com, samplesprousa.com, myamericanprizes.com, rewardzinga.com, zippywinner.com.

15. I have been informed by counsel and representatives of Spark Energy that upon receiving purchased leads from vendors like BriteBox and Inbounds.com, leads enter a system called ActiveProspect. In addition to consumer contact information and metadata such as date, time, and IP Address, each lead contains a "Trusted Form Certificate" verifying that it is a valid lead.[9]

### C. Energy BPO Dialing Center

16. Per my conversations with counsel, it is my understanding that through the ActiveProspect system leads may be allocated to any one of Spark Energy's several dialing vendors. One of the vendors dialing on behalf of Spark Energy during the period at issue is Energy BPO ("EBPO").[10]

17. I understand that when a lead is transferred to a vendor, the lead is eligible to be called by a representative. Once that lead is called, metadata associated with each call placed to the lead is sent back to the Spark ActiveProspect system to be recorded.[11] If there are updates to be made to the record on file within ActiveProspect, those updates will be performed upon receipt of this metadata.[12] For instance, if a recipient of a call has requested to be placed on a Do-Not-Call list, that information will be recorded in ActiveProspect and a block can be placed on dialing that number in the future.[13]

---

[9] Julio Astorga Depo. Tr. 25:3-7.
[10] This is my understanding from a conversation with counsel that occurred on November 14, 2024.
[11] *Id.*
[12] *Id.*
[13] *Id.*

### D. Convoso and VICIdial Data Produced

18. To my knowledge, Defendant Spark has not produced any dialer data associated with dialing activities throughout the class period at issue. However, upon request from Plaintiff, dialing vendor EBPO produced a limited set of call data.

19. On October 28, 2024, I received from counsel in this case, the following three files:

    a. Convoso.Call.Log.04.08.2024-04.14.2024.csv
    b. Convoso.Call.Log.12.04.2023-12.10.2023.csv
    c. EXPORT_CALL_REPORT_09.18-09.24.xlsx

20. I was informed by counsel that files "Convoso.Call.Log.04.08.2024-04.14.2024.csv" and "Convoso.Call.Log.12.04.2023-12.10.2023.csv" are sourced from the dialer platform Convoso and the file "EXPORT_CALL_REPORT_09.18-09.24.xlsx" is sourced from the dialer platform VICIdial, yet all three files were produced by EBPO (the "EBPO call data").

21. Below is a table containing the count of unique records per file as well as the date range when the calls took place:

| Source File | Record Count | First Call Record Date | Last Call Record Date |
|---|---|---|---|
| Convoso.Call.Log.04.08.2024-04.14.2024 | 232,931 | 4/8/2024 | 4/14/2024 |
| Convoso.Call.Log.12.04.2023-12.10.2023 | 65,892 | 12/4/2023 | 12/10/2023 |
| EXPORT_CALL_REPORT_09.18_09.24__in | 4,613 | 9/18/2023 | 9/24/2023 |

22. Contained within these data files are several key fields including the telephone number dialed, call duration and datetime at which the call was placed.

23. Another field that is critical to the understanding of call records is the call disposition code. A call disposition code details the recorded outcome of a call placed within a dialer system.

For example, if a call goes to voicemail, the call disposition code would contain a value indicating as such. Within the Convoso data, this value is populated within the field "StatusName" ("Status Name") and in the VICIdial data, this value is populated within the field "Status_Name" ("Status Name").[14]

24. Between all three populations of dialer data produced by EBPO, there are 73 unique call disposition codes contained within the Status Name field. To date, there has not been any information produced defining what each of these 73 call dispositions represent. Further, it should be noted that because the data produced in these files are sourced from two different dialer platforms, it is possible that one call disposition code that is present in data from both dialers could potentially have two different definitions.

25. Call disposition codes are often a combination of standardized codes defined by the manufacturer of the dialing system and customized codes defined by the organization using the system. The naming conventions may be obvious such as "voicemail" or they may be inscrutable such as "JYX." Prior to analyzing dialer data, it is critical to obtain a schema that defines the meaning of the call disposition codes used in the system or to review testimony of persons knowledgeable of such a system. Simply guessing what a code may mean and using those guesses to devise a class list is unscientific and unreliable.

26. To my knowledge, no information detailing the definitions of the call disposition codes contained within the EBPO call data exists in this case.

---

[14] Convoso.Call.Log.04.08.2024-04.14.2024.csv, Convoso.Call.Log.12.04.2023-12.10.2023.csv, EXPORT_CALL_REPORT_09.18-09.24.xlsx.

### E. Plaintiff Brian Clark and Calls to the 9772 Number

27. Plaintiff Brian Clark alleges to have received ten calls on his home telephone number (510) 316-9772 (the "9772 Number") dated between March 3, 2023 and March 21, 2023.[15]

28. Mr. Clark alleges he is the owner of the 9772 Number and has used it as a residential telephone line for more than ten years.[16] Mr. Clark alleges he registered this number on the National Do-Not-Call Registry on December 22, 2007, and has solely used this telephone number since that time.[17]

29. For each of the calls alleged in his complaint, Mr. Clark claims to have received an automated voicemail using an artificial voice of a woman identifying herself as "Michelle", requesting to discuss his natural gas bill and requesting a call back at the number (888) 928-3199.

[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

[15] First Amended Complaint_20240522, ¶13.
[16] First Amended Complaint_20240522, ¶14.
[17] First Amended Complaint_20240522, ¶15.

### F. The Class Allegations

30. Plaintiff seeks to certify the following classes:

> *Sub-Class No. 1:*
> "All persons and entities located within the United States of America who claim to be able to provide a phone bill or statement showing they were a residential telephone subscriber and that their number was registered on the National Do-Not-Call Registry to whose residential telephone Defendants and/or their agents transmitted two or more telemarketing calls in one calendar year without prior express written consent from the called party or an 'existing business relationship' at any time from January 30, 2020 to the present, including up to and through trial."[18]
>
> *Sub-Class No. 2:*
> "All persons and entities located within the United States of America to whose residential telephone line Defendants and/or its agents transmitted a call using a prerecorded voice without prior express written consent from the called party at any time from January 30, 2020 to the present, including up to and through trial."[19]

### G. The Expert Report of Anya Verkhovskaya

31. Plaintiff's Expert Anya Verkhovskaya issued a report with the following opinions:

> Opinion 1: Using the data produced by Defendant and/or agents acting on its behalf, there is a reliable and efficient method by which it can be determined whether Defendant and/or agents acting on its behalf made two or more telephone calls within any 12-month period to telephone numbers that 1) had been on the NDNCR for 32 days or more; 2) were most likely residential (as opposed to business); and 3) were not Defendant's customers.
>
> Opinion 2: Using the data produced by Defendant and/or agents acting on its behalf, there is a reliable and efficient method by which the subscribers and/or users who received telephone calls made by Defendant and/or agents acting on its behalf during the proposed Class period can be identified and located.
>
> Opinion 3: Using the data produced by Defendant and/or agents acting on its behalf, there is a reliable and efficient method of efficiently and effectively notifying the proposed Class that comports with the requirements of Federal Rule of Civil Procedure 23 and due process.[20]

---

[18] Class Action Complaint, ¶5.
[19] Class Action Complaint, ¶5.
[20] Expert Report of Anya Verkhovskaya, ¶11-13.

32. Ms. Verkhovskaya's Opinion 3 suggests that her methodology "comports with the requirements of Federal Rule of Civil Procedure 23 and due process."[21] This is a legal conclusion for the trier of fact and therefore I will not be addressing it in my report as it is outside the purview of my expert witness testimony.

33. Ms. Verkhovskaya is a prolific Plaintiff's expert witness whose resumé identifies hundreds of cases where she has served as a class administrator or expert witness. I have served as the lead analyst in many cases where she served as a Plaintiff's witness in the last three years and am familiar with her work prior to that date due to the work I performed as an analyst. I am extensively familiar with the various plans she has submitted on behalf of Plaintiffs in TCPA cases that purport to identify alleged class members. I have personally analyzed and tested the work she has produced, which she claims establishes an effective and/or reliable methodology.

34. In this case, consistent with the other cases where I have received her work, Ms. Verkhovskaya describes a vague and convoluted process where she claims to have arrived at a population of "NDNCR Residential Numbers" that received "NDNCR Residential Calls." It should be noted that she does not opine that the population of telephone numbers that she identifies as the "NDNCR Residential Numbers" at the conclusion of her analysis are telephone numbers belonging to persons that fit the proposed class definition. She simple alleges she can perform a set of steps that will result in a list of telephone numbers that she can use third-party data to associate a name with the telephone number and serve that name with notice.

35. Ms. Verkhovskaya's analysis relies on the following three files:

---

[21] Expert Report of Anya Verkhovskaya, ¶13.

a. Convoso.Call.Log.04.08.2024-04.14.2024.csv
b. Convoso.Call.Log.12.04.2023-12.10.2023.csv
c. EXPORT_CALL_REPORT_09.18-09.24.xlsx

36. Ms. Verkhovskaya claims that she first loaded the data into ".SQL staging tables." She does not define what a staging table is in her report. Ms. Verkhovskaya also claims she documented her data loading process in Exhibit 4 to her report, stating that Exhibit 4 contains "the number of records per file to ensure that the data load was executed correctly."[22]

37. Exhibit 4 does not contain multiple staging tables as she alleges. Instead, it appears to contain only one singular table as there is only one "Running Total of Records" in Exhibit 4 and it appears to be associated with a "Master Table."[23] It is unclear what data was used to create this "Master Table" and there is no record count provided as stated in her report. Her failure to identify the individual data sets and associated record counts as well as the inconsistency between her written report and Exhibit 4 makes it difficult to both understand and validate her analysis from the start.

38. Because the staging tables she references are absent, I can only assume that she did not load the data to multiple individual staging tables as she alleges, but instead loaded all of the data into one table, which she refers to as a "Master Table." This assumption is supported by the "Data Mapping" document which she produced as Exhibit 5 to her report in which she selects from each data file only the specific fields she determined to be relevant to her analysis.

[22] Expert Report of Anya Verkhovskaya, ¶52.
[23] Expert Report of Anya Verkhovskaya, Exhibit 4.

39. It is not possible for me to test the accuracy of her data loading and mapping as she failed to produce the intermediate workpapers from which such a determination could be made. By simply producing the final product of her work with no underlying data, she significantly limits any ability to check the accuracy of the individual steps she conducted. It is indeterminable whether she executed this data loading or mapping exercise correctly as she has not produced any exhibit containing the output.

40. Ms. Verkhovskaya states that in addition to standardizing the fields that she relied on from each data set, she then filtered the data to remove from her analysis non-ten-digit telephone numbers.[24] She removed leading digits such as "0", "1" and "9" as well as non-numeric characters from telephone numbers, and she filtered further to include only telephone numbers with valid area codes per the North American Number Plan Administration ("NANPA").[25]

41. Ms. Verkhovskaya states that she also removed duplicate telephone calls, as well as calls occurring outside of the proposed class period.[26] She then filtered the population of calls further to include only calls with a "CallType" of "OUTBOUND."[27] It is unclear how she could have filtered the call data within her population coming from the file 'EXPORT_CALL_REPORT_09.18-09.24.xlsx,' as there is no column called "CallType" that indicates whether the calls are inbound or outbound.

[24] Expert Report of Anya Verkhovskaya, ¶57.
[25] Expert Report of Anya Verkhovskaya, ¶57.
[26] Expert Report of Anya Verkhovskaya, ¶57.
[27] Expert Report of Anya Verkhovskaya, ¶58.

42. The last step in her initial filtration process was to exclude calls with the following dispositions:

a. "Operator Intercept"
b. "System Busy"
c. "Line is Busy"
d. "Inbound Queue Timeout Drop"
e. "Bot Calls"
f. "Current Customer"
g. "Busy"
h. "Commercial Business"
i. "Disconnected Number"
j. "Test Call"[28]

43. Ms. Verkhovskaya offers no explanation as to why she only excluded these ten call disposition codes of the 73 total unique call disposition codes contained within the call data.

44. As a result of this filtration process, Ms. Verkhovskaya states that she has identified 270,109 calls placed to 118,476 unique telephone numbers that she refers to as the "Standardized Dispositioned Records" contained in Exhibit 6 to her report.[29]

45. Ms. Verkhovskaya next attempted to identify the telephone numbers contained in Exhibit 6 that received two or more calls within a 12-month period after the telephone number was on the NDNCR for 32 days or more.[30] To identify these numbers, she states she supplied telephone numbers that received two or more calls to PacificEast, which returned data

[28] Expert Report of Anya Verkhovskaya, ¶58.
[29] Expert Report of Anya Verkhovskaya, ¶58.
[30] Expert Report of Anya Verkhovskaya, ¶59.

indicating whether the number had been added to the NDNCR and if so, the most recent date on which that occurred.[31]

46. Ms. Verkhovskaya stated that she supplied 61,642 telephone numbers to PacificEast to check against the NDNCR and these numbers are contained in Exhibit 7 to her report.[32] Confirmation from PacificEast of the search criteria used is included as Exhibit 8 to her report.[33] The data returned by PacificEast as a result of this search is included as Exhibit 9 to her report.[34]

47. Ms. Verkhovskaya states that the "Job Complete Notification" for this searching is included in "Exhibit 60" to her report.[35] There is no Exhibit 60 contained in the documents she produced, and the last exhibit to her report is numbered 17. Instead of Exhibit "60" she appears to be referencing Exhibit 10 to her report wherein PacificEast identified 19,913 telephone numbers as "DNC – Suppressed."[36]

48. Based on PacificEast data contained in Exhibit 9, Ms. Verkhovskaya claims to have identified 19,025 telephone numbers that received two or more calls, that she refers to as "Standardized Dispositioned Numbers," within a 12-month period, after being on the NDNCR for 32 days or more. She claims this set of telephone numbers are contained in "Exhibit 71" to her report.[37] There is no Exhibit 71 attached to her report, and the last exhibit is Exhibit 17. Exhibit 11 to her report does, however, contain 19,025 telephone numbers and a field called "call counts."[38]

---

[31] Expert Report of Anya Verkhovskaya, ¶65.
[32] Expert Report of Anya Verkhovskaya, ¶64.
[33] Expert Report of Anya Verkhovskaya, ¶64.
[34] Expert Report of Anya Verkhovskaya, ¶65.
[35] Expert Report of Anya Verkhovskaya, ¶65.
[36] Expert Report of Anya Verkhovskaya, Exhibit 10.
[37] Expert Report of Anya Verkhovskaya, ¶66.
[38] Expert Report of Anya Verkhovskaya, Exhibit 11.

49. Ms. Verkhovskaya alleges to have devised a process by which she could remove telephone numbers used as business lines at the time of the calls by, again, submitting them to PacificEast to perform Business/Residential searching.[39] The file submitted to PacificEast is included with her report as Exhibit 12 and contains 19,025 unique numbers, each with a date range of January 31, 2019 to October 18, 2024.[40]

50. Following submission of this search, Ms. Verkhovskaya received a confirmation email from PacificEast that she states is included as "Exhibit 83" to her report.[41] There is no "Exhibit 83" attached to her report. Again, the last numbered exhibit is Exhibit 17. Exhibit 13 to her report does appear to contain a work order submission confirmation from PacificEast, however this work order states that she is requesting a Historical Line Identification Append with Special Instructions to include multiples.[42]

51. When a search is submitted to PacificEast with the instruction to include multiples, this means that instead of appending just one associated record, PacificEast will append up to ten possible results.


**Services**
Services Required: Line Identification Append - Historical

**Special Instructions**
run reverse lookups (with multiples) after the LIA portion

52. Because of this instruction, Exhibit 13 does not include the Business/Residential Line Searching product offered by PacificEast.[43]

---

[39] Expert Report of Anya Verkhovskaya, ¶73.
[40] Expert Report of Anya Verkhovskaya, Exhibit 12.
[41] Expert Report of Anya Verkhovskaya, ¶73.
[42] Expert Report of Anya Verkhovskaya, Exhibit 13.
[43] Expert Report of Anya Verkhovskaya, Exhibit 13.

53. I have used PacificEast data for many years and am familiar with the search protocols that they employ. In order to retrieve results from PacificEast containing the Business/Residential coding, a request for this data must be specified in the job order with a value of "B/R" indicating the product requested. An example of a recent search run by my team is included below:




54. Ms. Verkhovskaya's report claims that the business line identification output she received from PacificEast is attached to her report as "Exhibit 94."[44] There is no "Exhibit 94" attached to her report and the last attachment is Exhibit 17. Exhibit 14 to her report appears to contain name and address associations for 19,025 unique telephone numbers and is presumably the results of a Historical Line Identification Append requested from PacificEast in this step of her analysis.[45] As expected from the work order notification produced as Exhibit 13 to her report, the output contained in Exhibit 14 does not contain a Business/Residential coding because she did not run a Business/Residential search through PacificEast.

---

[44] Expert Report of Anya Verkhovskaya, ¶74.
[45] Expert Report of Anya Verkhovskaya, Exhibit 14.

55. She states that confirmation of the completion of this searching is attached as "Exhibit 105" to her report.[46] There is no "Exhibit 105" included with her report. Exhibit 15 to her report appears to contain a "Job Complete Notification" from PacificEast.[47]

56. Utilizing the search results obtained from PacificEast, Ms. Verkhovskaya claims she removed from consideration any telephone numbers that PacificEast returned a value within the field "FullName-business."[48] She also claims to have removed any telephone numbers that matched a key word search she deployed using business terms identified in Exhibit 16 to her report.[49]

57. Presumably because her PacificEast search results did not contain Business/Residential coding, she does not identify any telephone numbers she removed because PacificEast identified them as business lines. Further, she gives no explanation as to how she determined the "business-affiliated keywords" she used to narrow the population of telephone numbers or how she matched them to the data returned by PacificEast.

58. Ms. Verkhovskaya states that the resulting population from this final step in her analysis is a total of 18,641 unique telephone numbers, contained in Exhibit 17 to her report, that received 64,230 calls.

[46] Expert Report of Anya Verkhovskaya, ¶74.
[47] Expert Report of Anya Verkhovskaya, Exhibit 15.
[48] Expert Report of Anya Verkhovskaya, ¶75.
[49] Expert Report of Anya Verkhovskaya, ¶76.

## V. ANALYSIS & OPINIONS

### A. It Is My Opinion, Based On A Reasonable Degree Of Professional Certainty, That The Purported Class Member Identification Process Suggested By Anya Verkhovskaya In Her Expert Report Dated October 22, 2024, Is Unreliable And There Is No Way, Absent An Individualized Investigation, To Identify Purported Class Members

59. It is my opinion that there is no systematic or automated way to identify potential class members. Further, a substantial portion of telephone numbers dialed on behalf of Spark and identified by Ms. Verkhovskaya (a) were submitted to Spark's verified lead generators by consumers with consent to call via webform; and/or (b) were reassigned after being placed on the NDNCR; and/or (c) are business lines.

60. Ms. Verkhovskaya describes a vague and overly simplified filtering methodology that relies heavily on third-party data vendors, which she purports to be reliable, accurate and efficient. However, she fails to take into consideration the business practices of Spark, particularly their acquisition of leads via webform, the potential that a telephone number has been reassigned after being placed on the NDNCR, and the nuances of customer relationships as well as the challenges in accurately identifying business lines.

***Inbounds.com Verified Lead Data***

61. I requested from counsel any available lead data and received the following three files containing a total of 1,538,731 unique records dated from May 17, 2022 to April 26, 2024:

| Filename | Record Count | Start Date | End Date |
|---|---|---|---|
| AcquireCrowd_2022.csv | 650,477 | 5/17/2022 | 12/30/2022 |
| AcquireCrowd_2023.csv | 803,571 | 1/2/2023 | 12/31/2023 |
| AcquireCrowd_2024.csv | 84,683 | 1/1/2024 | 4/26/2024 |

62. It is my understanding based on information provided to me by Defendant's counsel that the above listed files constitute only a portion of leads collected by verified lead generator Inbounds.com and purchased by Spark. It should be noted that Inbounds.com is not the only lead generator from which Spark purchases verified leads. To my knowledge, Spark purchases leads from several other vendors, including BriteBox.

63. It should also be noted that Spark engaged several third-party call centers to dial on their behalf and distributed purchased leads amongst all of them. This means that leads from one lead generator were not all dialed by the same dialer.

64. In my analysis of the Inbounds.com lead data, I first sought to identify all the leads received by Spark from Inbounds.com containing a telephone number that was also dialed in the EBPO call data. In total, I identified 8,574 unique telephone numbers that were contained in both data sets. These 8,574 telephone numbers are attached as Exhibit 3.

65. Next, I compared the date contained in the lead record for each telephone number with the date of the first call placed to each telephone number in the EBPO call data. In doing so, I found that of the 8,574 telephone numbers for which lead data existed, the date the lead was acquired occurred ***prior*** to the first call placed to the telephone number for 8,573 of the 8,574 telephone numbers, or 99.99% of the time.[50]

66. Of the 18,641 unique telephone numbers contained in Ms. Verkhovskaya's Exhibit 17, 2,318 are contained within the Inbounds.com lead data, **all** of them with a lead date prior to the first call being placed in the EBPO call data.

[50] There is only one telephone number that was dialed in the EBPO call data prior to the date the lead was generated in the Inbounds.com lead data. However, it is possible that this number was received from another lead generator utilized by Spark as I only have access to a limited set of lead data. This telephone number is (914) 960-5686 and requires additional individualized inquiry.

67. Based on these results, it is my opinion that additional lead data from other vendors from which leads were purchased by Spark, would likely identify additional telephone numbers that were submitted with consent prior to calls being placed, requiring additional individualized inquiry.

***BriteBox Verified Lead Data***

68. Upon my inquiry about lead data, I was also provided with the below two files that I understand contain lead data purchased by Spark from Britebox. These two files contain a total of 2,394 leads obtained on just two days.

| File Name | Record Count | Date |
|---|---|---|
| Opt Ins CAG Britebox 3.01_3.08 0330PM.xlsx | 1,466 | 3/8/2022 |
| CAG_CA_Optins_11_05_22___12_00_00AM 1006.csv | 928 | 11/4/2022 |

69. I performed the same comparative analysis that was performed on the Inbounds.com lead data and identified 9 leads that were dialed within the EBPO call data. All 9 of these leads were submitted with consent ***prior*** to the first call being placed to the telephone number. Three of these telephone numbers are contained in Exhibit 17 to Ms. Verkhovskaya's report.

***Sampling Analysis of Business Line Identification and Reassignment***

70. To further examine the telephone numbers identified by Ms. Verkhovskaya as potential class members, I extracted a random sample of 377 unique telephone numbers from her Exhibit 17 population of 18,641 telephone numbers. This randomly selected population meets the criteria of a statistically significant and representative sample at a confidence interval of 95% with a margin of error of 5%.

71. In extracting this sample, I sought to examine instances (1) where telephone numbers were reassigned after having been placed on the NDNCR indicating that the recipient of telephone calls is *not* the individual that registered the telephone number; (2) where business lines could be identified through Business/Residential line searching performed through PacificEast; and/or (3) where business lines can be identified through manual internet research.

72. In my analysis of the sample of 377 unique telephone numbers, I first removed the telephone numbers identified in my previous analysis as having a verified lead submitted prior to receiving any calls in the EBPO call data. There is a total of 49 (12.99%) of the 377 telephone numbers for which a lead was submitted prior to the first call being placed to the telephone number resulting in a remaining population of 328 telephone numbers for consideration in my analysis.

73. Next, I sought to identify telephone numbers that were reassigned after the date on which they were added to the NDNCR indicating that the individual that received the calls was not the individual that registered it. To identify these numbers, I submitted to data vendor Contact Center Compliance ("CCC") a list of the telephone numbers and the associated date.[51] Upon submission, CCC appended to the data a field called 'IsReassigned' with a value of '1' indicating that a number has been reassigned since the associated NDNCR date.[52] If the field IsReassigned is populated with any value other than a value of '1' the telephone number has not been reassigned since the associated date.

[51] Contact Center Compliance is a call center compliance solutions firm offering research in reassigned telephone numbers and other TCPA compliance solutions.
[52] The output of this search is attached as Exhibit 4.

74. From the remaining population of 328 telephone numbers within the sample, 136 (41.46%) had been reassigned. This results in a remaining population of 192 unique telephone numbers.

75. Next, I submitted the sample of telephone numbers to PacificEast to conduct a search using their Business/Residential searching product. Upon submission of this search, PacificEast returned a file containing a coding of 'B' indicating business or 'R' indicating residential for the telephone numbers submitted.[53] This search identified 5 of the remaining 192 telephone numbers in the sample as business lines.

76. Through these filtering steps, I was able to remove a total of 190 (50.4%) of the sample of 377 unique numbers. A summary of these removals is detailed below.

| Removal Category | Count of Phone Number | Percentage of Sample |
|---|---|---|
| Inbound Lead Prior to Calls | 49 | 13.00% |
| Number Reassigned Since NDNCR | 136 | 36.07% |
| Identified as Business by PacificEast | 5 | 1.33% |
| | 190 | 50.40% |

77. Following these removals, I performed manual internet research to identify any publicly listed business associations with any of the individual remaining 187 telephone numbers in the sample.

78. Through manual internet research of a portion of the remaining individual telephone numbers in the sample, I was able to identify at least 6 telephone numbers that were associated with businesses. Below are some examples of my findings:

[53] In instances where PacificEast cannot make a determination as to whether the line is business or residential, they may not return a coding.

**Telephone Number (209) 243-9075**

This number is publicly listed as being the main contact number for "R Safe Specialty," a safety equipment supplier out of Newman, California.[54]




**Telephone Number (209) 271-1789**

According to a Facebook post from Deanna Estes dated May 22, 2016, she is using this telephone number as a primary contact to recruit employees for a firm called Galactic Marketing LLC.[55]




[54] https://www.macraesbluebook.com/search/company.cfm?company=1365267

[55] https://www.facebook.com/groups/obamaphone/posts/850869575017221/?_rdr.

**Telephone Number (315) 244-3954**

This number was posted as recently as 2020 as a way of contacting Tanglz Hair Salon.[56]


Tanglz Hair Salon
May 26, 2020 ·

Tanglz Hair Salon will be reopening on June 1st.We are going to do a soft opening until all phases are opened back up. Shelley will be working on Tuesdays and Thursdays please call or text her for an appointment at 315-296-4505. Mary will be working Wednesdays and Fridays please call or text at 315-212-4147. Sandy will be working Monday and Thursday please call or text at 315-244-3954. We will be contacting the people who have called or texted us. If for some reason you aren't called in the next few days please contact us again. A mask must be worn by the customer and hairdresser and we will come out and get you when we are done cleaning and sanitizing from our previous customer.This is going to be different for everyone so please bear with us through all of it. Thank you everyone for your patience and understanding. Shelley, Mary, And Sandy

6 8 shares

Like Comment

**Telephone Number (408) 203-2778**

This number was publicly listed as recently as 2022 as the phone contact for Art Doc Film Festival out of Boulder Creek, California.[57]


Post on Twitter

Share on Facebook

Event Type
Film Festival

Years Running
First Year

Contact
Email
408-203-2778
13700 Bear Creek rd.
Boulder Creek, CA 95006
United States

The ArtDoc film festival is debuting in 2022 dedicated to the presentation of short documentaries dedicated to art, artists, and artistic expression. Whether it's painting, music, sculpture, dance, craft, architecture, or perormance, we are presenting films that explore what it means to make, or be, art.

Awards & Prizes
Best Film

Rules & Terms
Film 60 minutes or less.
Must be digitally projectable.

2 Reviews ★★★★★ Review Festival

| | | | |
|---|---|---|---|
| Overall Rating | ★★★★★ | Communication | ★★★★★ |
| Quality | ★★★★★ | Hospitality | ★★★★★ |
| Value | ★★★★★ | Networking | ★★★★★ |

[56] https://www.facebook.com/TanglzHairSalon/posts/3829206163820974/?_rdr.

[57] https://filmfreeway.com/ArtDocFilmFestival.

**Telephone Number (408) 499-3985**

This number is listed publicly as the line on which to contact realtor Erskine Sankey of CP Properties out of San Jose, California.[58]




**Telephone Number (408) 515-2304**

This telephone number is currently listed as contact information for Dr. Surekha S. Vetsa on medifind.com.[59]




[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

58 https://go.sccaor.com/realtordirectory/Details/erskine-sankey-2187986.

59 https://www.medifind.com/procedures/bladder-reconstruction/6608/doctors/surekha-s-vetsa/9142013.

79. Although many of the telephone numbers contained within my sample can be removed through the filtering and individualized investigation I've applied in my analysis, the remaining population of 181 unique numbers require further individualized investigation. Due to the lack of data produced in this case, the following remains unknown:

a. Whether a given telephone number was acquired through a verified lead other than those currently available to me and mentioned in this report; and

b. Whether the owner of the telephone number has an existing business relationship with Spark.

80. It is my opinion that with additional data such as lead generation data, customer relationship management platforms, customer/vendor account and transactional data, as well as account notes, among other pieces of relevant information required for further individualized investigation, more can be determined about the relationships between proposed class members and Spark. As such, a substantial amount of telephone numbers, if not all, can be removed from consideration.

**B. Ms. Verkhovskaya's Work Contains Clear And Rampant Mistakes Making Her Proposed Methodology Nearly Incomprehensible And Calling Into Question Her Understanding And Use Of Third-Party Vendor Data**

81. Throughout her report, Ms. Verkhovskaya frequently makes errors when referring to the Exhibits she produced and what they contain. For example, in paragraph 74 of her report, she refers to Exhibits 94 and 105. A review of the materials produced with her report reveals that there is not an Exhibit 94 to her report, nor is there an Exhibit 105, and the last exhibit is Exhibit 17.

82. These are not one off, understandable typo errors. Instead, these are serious mistakes that are consistent with a haphazard approach to what should be rigorous analysis which undergoes quality control testing prior to being presented as work upon which a court can rely. Such careless and error ridden analysis is a hallmark of her work and courts have noted and criticized her for it in opinions in other cases.[60]

83. The frequent mislabeling of exhibits made her report exceptionally difficult to follow as I attempted to line up the data she had produced with analysis and assertions she had made in her report. Further, in reviewing the content of the exhibits, I found that often when I could deduce which item(s) she was referring, the content did not appear to align with the details she had included in her report, particularly when it came to the third-party data on which she relied upon for her analysis.

***PacificEast NDNCR Data***

84. Ms. Verkhovskaya states that to determine if telephone numbers were placed on the NDNCR, she provided the numbers identified in her filtering process to third-party data vendor PacificEast to perform a search wherein PacificEast would append to her list whether the telephone number was added to the NDNCR and the most recent date on which that occurred.

85. Ms. Verkhovskaya attached the output returned by PacificEast for this search as Exhibit 9 to her report. I examined the text file produced as Exhibit 9 and found that it contains four unique data fields. The first field contains the telephone number provided to PacificEast

---

[60] *Davis v. Capital One, N.A.*, No. 1:22-cv-00903 (E.D. Va.); *Carroll v. SGS Automotive Services, Inc*., No. 3:16-cv-00537-SDD-RLB (M.D. La.); *Wilson v. Badcock Home Furniture*, No. 8:17-cv-02739-T-02AAS (M.D. Fla.); *Goins v. Palmer Recovery Attorneys, PLLC*, No. 6:17-cv-654-Orl-GAP-KRS. Dkt. 59-7 at 18.

and the following three fields contain data appended by PacificEast. This file does not include headers indicating what values each field contains.

86. Below is a screenshot of the file produced showing the four fields contained within Exhibit 9 to the Verkhovskaya report and the lack of headers:

Exhibit 9 02684_120906.txt - Notepad

File Edit Format View Help

| | | | |
|---|---|---|---|
| 2012133345 | S | 4 | |
| 2012136466 | S | 4 | |
| 2012389975 | S | 4 | |
| 2012745014 | S | 4 | 2013-06-21 |
| 2014421382 | S | 4 | |
| 2014799522 | | | |
| 2014799714 | | | |
| 2014943885 | S | 4 | 2015-03-13 |
| 2015471081 | | | |
| 2016061175 | S | 4 | |

87. In my experience in conducting searches through PacificEast, it is common to receive output files from their services that do not contain headers. Instead, PacificEast provides what is called a “Layout,” which details the fields that are appended to the file and defines the values contained within them.

[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

88. In an email to PacificEast representative Andrew Watts on November 5, 2024, I inquired about what NDNCR Searching products are offered by PacificEast, what data each of these products relies on as well as what data is appended by PacificEast.[61] Mr. Watts stated that the following two searches can be performed through PacificEast:

a. "Do Not Call (DNC) Historic – Matches call lists against the available Federal, State and DMA Do-Not-Call Registry file at a particular point in time."[62]

b. "Do Not Call (DNC) Current - Do Not Call (DNC) is a service that gives telemarketers and users of telemarketing services the ability to "clean" or "scrub" their call lists against the available Federal and State Do-Not-Call Registry files. This service can only be provided to Customer if Customer acquires a license to the appropriate Do-Not-Call lists and provides Vendor with the resulting Subscription Account Number (SAN)."[63]

89. Ms. Verkhovskaya does not specify within her report, nor does the work order confirmation produced as Exhibit 8 indicate which of these products she used to conduct her searching. It should be noted that regardless of the product Ms. Verkhovskaya employed for her analysis, PacificEast is searching both State and Federal DNC lists.

[61] Email correspondence with Andrew Watts attached as Exhibit 5.
[62] *Id.*
[63] *Id.*

90. Mr. Watts stated that there are two possible output layouts—an older version and a newer version. Both layouts contain a field, DNC Code Flag, indicating whether the telephone number submitted to PacificEast matched to a DNC. This field could contain any of the following values:

   a. N – Not Checked
   b. M – Invalid Numbers
   c. S – Suppressed (numbers identified as being on a DNC)
   d. L – Federal DNC License Violations
   e. W – Wireless Numbers in no-wireless states (Applies to state DNC only)
   f. BLANK – No Match (Not found on a DNC)[64]

91. Based on the values within the second column of data contained within Verkhovskaya's Exhibit 9, this is likely the DNC Code Flag.

92. However, only the older layout returns a field containing the values observed in the third column of data contained within Exhibit 9 to Ms. Verkhovskaya's report. This field appears to be the List Category Code that indicates the category of DNC list on which a Suppressed telephone number was found. This field could contain any of the following values:

   a. 0 = Number matched on a DNC state list
   b. 2 = DNC number removed at the compiler
   c. 3 = Number matched on the Federal DNC List
   d. 4 = Number matched on the wireless list
   e. X = Unknown[65]

93. In my review of the results contained in Exhibit 9 to Ms. Verkhovskaya's report, I found that of the 19,913 telephone numbers identified by PacificEast as Suppressed, 17,239 (86.57%) were identified with a List Category Code of "4."

[64] PacificEast DNC Searching Layout, attached as Exhibit 6.
[65] *Id.*

94. I asked Mr. Watts, if PacificEast appended a DNC Code Flag value of "S," indicating that a number is on a DNC, as well as a List Category Code with a value of "4" for a telephone number searched using the Do Not Call searching, whether it would be possible to determine if that telephone number was on a State or Federal Do Not Call List. He stated, "there's no way to determine, using the old format, if a wireless number (flag "S", list "4") is on either the federal or state DNC."[66]

95. Given this information, I cross-referenced Ms. Verkhovskaya's population of telephone numbers contained in Exhibit 17 to her report with the PacificEast output included as Exhibit 9. I found that there are 16,082 (86.27%) telephone numbers identified by Ms. Verkhovskaya as being on the NDNCR that had a List Category Code of "4" indicating that it cannot be determined whether the telephone number was on a State or the Federal DNC list using the data she acquired from PacificEast.

96. This demonstrates a gross misunderstanding and misuse of the data on which she relied for her analysis.

***PacificEast Business/Residential Searching***

97. In addition to offering DNC searching services, PacificEast offers other products that can assist in identifying telephone numbers that are associated with businesses. For example, if a telephone number is submitted to PacificEast for a Historical Line Identification Append ("HLIA") search, PacificEast will return names of individuals as well as businesses along with addresses and other identifying information associated with the telephone number throughout time.

[66] *See* Exhibit 5.

98. In addition to this data, PacificEast includes "FirstSeen" and "LastSeen" dates which indicate the date range in which PacificEast associates the individual or business with the telephone number.

99. PacificEast also offers a service called Business/Residential searching wherein given a telephone number, PacificEast will return a value of "B" or "R" indicating whether their aggregated data can associate that telephone number with a business or a residence.

100. In my experience performing HLIA and Business/Residential searching through PacificEast, I have found that although both products identify businesses, searching the same telephone number using both products does not always yield the same result.

101. For example, telephone number (916) 541-3993 is contained within Ms. Verkhovskaya's PacificEast output produced as Exhibit 14 without a business name identified. However, when searched with PacificEast's Business/Residential product, PacificEast indicates that this is a business line. Per the California Transportation webpage at ca.gov, this telephone number is registered to Teichert Construction.[67]

| Teichert Construction | |
|---|---|
| 3500 American River Dr SAcramento | |
| Phone: 916-541-3993 | Fax Number: |

102. Because Ms. Verkhovskaya has relied only on an HLIA search to identify businesses, she has included this telephone number in her Exhibit 17 as a residential number.

103. Through my experience identifying instances like this, it has become standard practice for me to conduct both forms of searching to effectively identify businesses in my analysis.

---

[67] https://ppmoe.dot.ca.gov/des/oe/planholders/getph.php?c=04-3Q4404&b=y.

104. In her report, Ms. Verkhovskaya refers to data submitted to PacificEast for Business or Residential line filtering in her analysis as "PacificEast Bus/Res Input" and data received from PacificEast as a result of this searching as "PacificEast Bus/Res Output."[68] However, a review of the work order submission confirmation produced as Exhibit 13 to her report indicates that Ms. Verkhovskaya did not employ the Business/Residential searching product and instead she relied only on the HLIA search to identify businesses in this step of her analysis.

105. In doing so, Ms. Verkhovskaya severely limits her ability to accurately filter for business lines using the data available to her.

106. Ms. Verkhovskaya's decision to use only the HLIA search to identify business lines within the population is a neglectful misstep as it fails to take into consideration additional data that could potentially identify any number of business lines contained within the population of telephone numbers she has identified.

***Application of PacificEast HLIA Data for Business Line Identification***

107. Upon receiving the HLIA data, Ms. Verkhovskaya states that she identified and removed telephone numbers which had any value in the field "FullName-business" at any time during the proposed class period.[69]

108. In my analysis of Ms. Verkhovskaya's work, I tested her application of this filtering by cross-referencing the telephone numbers contained within her final population, Exhibit 17, with the data returned from PacificEast contained within Exhibit 14 to see if there were any telephone numbers for which PacificEast identified a business name during the class period.

---

[68] Expert Report of Anya Verkhovskaya, ¶73-74.
[69] Expert Report of Anya Verkhovskaya, ¶75.

109. In performing this analysis, I identified at least 209 unique telephone numbers for which PacificEast returned a business name, which were not removed from Ms. Verkhovskaya's analysis.[70] Below I've included 15 examples of businesses identified with FirstSeen and LastSeen dates within the class period that Ms. Verkhovskaya failed to remove from consideration in her analysis:

| ConsumerTelephone | FullName-business | FirstSeen | LastSeen |
|---|---|---|---|
| 2034947716 | SOSENSKY LAW FI | 20140711 | 20231213 |
| 2092501215 | OFF ROAD TOYS RODE | 20220804 | 20230201 |
| 2094955109 | GONZALEZ CENTER FOR JUSTICE THE | 20090712 | 20240302 |
| 2095212552 | DUARTE JEFFREY R FRAILING ROCKWELL KELLY DURANTE | 20240701 | 20240804 |
| 2095875582 | MJ HALL COMPANY | 20100206 | 20230703 |
| 2096226390 | BUTLER CUSTOM PAINTING | 20160714 | 20230715 |
| 2096260346 | POLLARD FAMILY DENTISTRY | 20240630 | 20240702 |
| 2099140595 | WILLIAMS REGINA C ATTORNEY AT LAW | 20061204 | 20240302 |
| 3047046978 | TRAVIS CHRISTOPHER P DDS | 20240514 | 20240514 |
| 3077526928 | NELSONS INDEPENDENT NURSING SERVICE | 20180925 | 20231129 |
| 4082968814 | PARIS CONSTRUCTION | 20060728 | 20231104 |
| 4084106417 | BISH CHRISTOPHER | 20061025 | 20240122 |
| 4084226705 | BULLARD HEATING & AIR | 20240509 | 20240509 |
| 4084550708 | COLLINS PRISCILLA | 20220509 | 20240205 |
| 4084800771 | PAPADOPOULOS PAINTING COMPANY | 20150604 | 20240104 |

110. Although Ms. Verkhovskaya appears to apply some filtering to the population of calls she considers in her analysis, it is evident from the resulting population of telephone numbers contained in Exhibit 17 to her report as well as the supporting PacificEast data she has produced that this data has been misapplied.

[70] A full list of these telephone numbers, business names, first seen and last seen dates is attached as Exhibit 7.

### C. Ms. Verkhovskaya Performs No Testing Of Her Proposed Methodology And Her Explanations Of Her Process Lack Specification In Critical Steps That Would Substantially Impact The Size And Composition Of The Purported Class

111. Contained within the call data produced in this case are call disposition codes. Call disposition codes are applied to call records to indicate the result of a particular call. Within the three files analyzed by Verkhovskaya, there are a total of 73 unique call dispositions contained within the field "Status Name."[71]

112. Ms. Verkhovskaya states that to identify calls at issue in this case, she filtered the data to exclude the following call dispositions:

a. Operator Intercept
b. System Busy
c. Line is Busy
d. Inbound Queue Timeout Drop
e. Bot Calls
f. Current Customer
g. Busy
h. Commercial Business
i. Disconnected Number
j. Test Call[72]

113. In doing so, she offered no explanation as to why she determined that she should exclude these specific dispositions. Conversely, she offered no explanation as to why she included dispositions she did. It is my understanding that no call disposition code lookup explaining these dispositions has been produced which would provide the basis for making such data cuts.

[71] *See* listing of unique call dispositions attached as Exhibit 8.
[72] Expert Report of Anya Verkhovskaya, ¶58.

114. Included in the calls she did not remove from consideration are dispositions such as the following:

a. Agent Force Logout
b. Blocked Call
c. Call Abandoned In Queue
d. Call ended at PBX
e. Call in Progress
f. Congested Temporarily
g. Congestion
h. Dead Air Ringing
i. Incomplete Call
j. Not Available
k. Outbound Local Channel Res Err
l. Pre-Routing Drop
m. Queue Drop Call Action Trigger
n. Scam Likely
o. Scam Likely / SPAM
p. Switch Hold
q. Unauthorized User

115. Based on my extensive experience in working with dialer data, calls receiving many of the call disposition codes listed above likely did not connect. For example, "Call ended at PBX" likely means that a call was initiated but did not leave the company PBX system and never rang. "Congestion" likely means that the call never successfully completed. To my knowledge, there has been no documentation produced in this case indicating what the meaning of each of these dispositions is. Further, because the data contained in the three files considered in Ms. Verkhovskaya's analysis was produced from two different dialer

platforms, it is possible that one call disposition code that is present in data from both dialers could potentially have two different definitions.

116. Without a thorough understanding of what each of these dispositions mean as well as the reasoning for which Ms. Verkhovskaya suggests limiting the dispositions, it is possible that her methodology is vastly over-counting calls placed by Defendant Spark.

### D. Ms. Verkhovskaya's Inability To Adequately Test Her Work And Provide A Clear Methodology For Class Identification Is A Serious Concern As She Has Repeatedly Demonstrated She Is Unable To Competently Execute The Type Of Work She Proposes

117. Ms. Verkhovskaya spends numerous pages of her report outlining references to her prior casework in which she claims courts have approved of and implemented her methodology. While it is true that Ms. Verkhovskaya has served as a Plaintiff's expert witness in a multitude of TCPA matters over the years, the cases she mentions where a court approved her methodology are several years old and she omits any reference to cases where the courts have questioned her competency and proposed methodologies, have denied certification on that basis and excluded her pursuant to *Daubert* challenges.[73]

118. I have served as the lead data analyst on many cases supporting another expert testifier where Ms. Verkhovskaya served as the Plaintiff's expert. Throughout my experience in my analytical role, Ms. Verkhovskaya's inaccurate work has materially impacted the integrity of the data she analyzes and her failure to adhere to analytical best practices results in work lacking credibility and accuracy. She has repeatedly demonstrated that the staff to whom she outsources her analysis are incapable of implementing large scale data analysis without

[73] For example, *Carroll v. SGS Automotive Services, Inc.*, No. 3:16-cv-00537-SDD-RLB (M.D. La.), among others.

making substantive and impactful mistakes and her lack of SQL skills means that she is incapable of effectively supervising the work or detecting the errors made by said staff.

119. In the case *Bumpus v. Realogy Holdings Corp, et al*, No. 3:19-cv-03309-JD (N.D. Cal.), Ms. Verkhovskaya alleged to have performed her analysis on one set of data, when in actuality, she had performed her analysis using an entirely different set of data than was detailed in her report, making it impossible to verify or replicate any of her analysis. Her inability to accurately reflect the data on which she relied in her analysis in her report resulted in hundreds of wasted hours spent by opposing experts attempting to make sense of the analysis. She provided an amended report in which she identified an additional **200** files which were previously undisclosed and contained an additional **5.5 million** rows of dialer data, stating that this was simply a "formatting error."

120. In *Usanovic v. eXp Realty, LLC,* No. 2:23-CV-00687-JLR (W.D. Wash.), Ms. Verkhovskaya managed to alter the timestamps of over 500,000 calls, making them appear to have taken place between midnight and one o'clock in the morning. She did not identify this error prior to including the altered timestamps in a series of spreadsheets she produced alongside her September 2024 report in which she alleged the data accurately represented the calls at issue. Her inability to maintain the integrity of the data in this case made it appear as though Defendant eXp Realty had accrued nearly $795,000,000 in potential fines under the TCPA.

121. Not only does Ms. Verkhovskaya frequently make mistakes in implementing the methodology she insists to be "reliable and efficient," but in at least one case, neither she nor the executor of the declaration on which she relied performed any of the data analysis.

That work appears to have been outsourced to her sister, who does not appear to be employed by her firm.

122. In *Elliot v. Humana,* No. 3:22-cv-329-RGJ (W.D. Ky.), Ms. Verkhovskaya offered her opinions based on the analytical work in the Declaration of Christina Peters-Stasiewicz, an employee of her firm Class Experts Group, LLC. The analytical work described in the Declaration of Ms. Peters-Stasiewicz could not be replicated as the descriptions of her work were incomplete and she failed to produce workpapers. It came to light that neither Ms. Peters-Stasiewicz nor Ms. Verkhovskaya performed any of the data analysis contained in this declaration. Instead, it was performed by Ms. Verkhovskaya's sister. It is unclear what qualifications Ms. Verkhovskaya's sister possesses to conduct this type of analysis or whether she conducted the work Ms. Verkhovskaya describes in her report in this matter.

[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

### E. Ms. Verkhovskaya's Methodology To Subpoena Telecommunications Providers Is Likely Not Feasible Because It Is Dependent On Her Use Of Restricted Data Which She Cannot Access As She Likely Does Not Possess The Required Provider Of Telecom Related Services ("PTRS") Certification And Her Proposed Use Of The Data Appears To Be Impermissible

123. Ms. Verkhovskaya states that to identify names and mailing addresses of the members of the purported classes, she will, "coordinate the carrier subpoena process."[74] She goes on to say:

> To be able to issue carrier subpoenas to correct telephone carriers, I would first identify which telephone carrier was responsible for maintaining which telephone numbers during the relevant timeframe. To achieve that I would work with Tel-Lingua.
>
> Tel-Lingua is the data processor I utilize for the historical carrier reverse append process. Tel-Lingua was created more than a decade ago to provide data mining solutions for the telecom industry.
>
> Tel-Lingua provides a number of Local Number Portability ("LNP") related service. LNP is a method for reassigning a telephone number from one telephone carrier to another, location or service type.
>
> The telephone numbers are processed through ahistorical telephone carrier reverse append process that I have coordinated through Tel-Lingua's Secure File Transfer Protocol ("SFTP") (the "Tel-Lingua Input").[75]

124. Ms. Verkhovskaya states that through Tel-Lingua, she will obtain data values such as the Operating Company Number (OCN), OCN Name, which is the carrier name, and the OCN Category, which is the carrier type, amongst other NPAC User Data values.

***NPAC User Data***

125. The Number Portability Administration Center ("NPAC") is an extension of the Federal Communications Commission ("FCC") handling the routing of telephone calls and text messages as well as the facilitation of the local number portability ("LNP") or the porting

---

[74] Expert Report of Anya Verkhovskaya, ¶112.
[75] Expert Report of Anya Verkhovskaya, ¶¶112-115.

of telephone numbers from landline to cellular or vice versa. In its capacity, NPAC generates a large volume of User Data logging the porting of telephone numbers and their associated carriers. This data is then maintained and made available for purchase by qualified third parties by iConnectiv.

126. To qualify to purchase NPAC User Data, the purchaser must be an authorized service provider of telecom-related services and maintain a PTRS (Providers of Telecom-Related Services) Certification.[76] I am not aware that Ms. Verkhovskaya provides the telecommunications services that would make her eligible for a PTRS certification and she has not alleged that she does nor that she possesses this certification. As such, Ms. Verkhovskaya does not meet the criteria to obtain such data and execute her plan to subpoena carriers through the use of this data.

127. Further, per the NPAC US Permitted Use Clarifications updated in 2020, the data can only be used in the facilitation of telecommunication services, with few exceptions, none of which include class member identification and notification in class action litigation.

> NPAC User Data is restricted and made available to qualified entities for Permitted Uses Only. NPAC User Data or Derived Data from NPAC User Data can be used by authorized Service Providers (including Contracted Network Users of Service Provider, and PTRS for routing, rating, billing and network maintenance on behalf of Service Providers. Under other Ancillary Service Agreements, other entities may qualify to use specific elements of NPAC User Data for specific purposes including law enforcement investigations, TCPA compliance, assessing risk and mitigating fraud.
>
> Permitted Users are defined her for service Providers (including their Contracted Network Users) and PTRS who have a need to gain access to NPAC User Data in order to perform or facilitate network maintenance or the routing, rating or billing of calls in connections with providing telecommunications services.[77]

[76] https://numberportability.com/about/permitted-use
[77] See NPAC US Permitted Use Clarifications attached as Exhibit 9.

128. To subpoena carriers as suggested by Ms. Verkhovskaya is dependent upon obtaining private NPAC User Data for which she does not appear to have the appropriate qualifications, certification, or permissible use. If true, it is concerning that she alleges she has performed this process in the past as doing so would have violated the privacy rights of the very consumers she and Plaintiff's counsel allege they represent.

129. Another Plaintiff's TCPA expert, Aaron Woolfson attempted to use NPAC User Data which was sold to him by Tel-Lingua CEO, Andrew Mangold, in the case *Bayles v. The Hertz Corporation*, No. 1:22-cv-1092 (S.D. Ind.). Like the methodology proposed in this case by Ms. Verkhovskaya, Mr. Woolfson was using the data to identify class members and he also lacked a PTRS certification. When informed of this violation, Mr. Mangold issued a letter suspending Mr. Woolfson's use of Tel-Lingua on the day of his scheduled deposition. The suspension letter stated that that Mr. Woolfson had accessed NPAC User Data without a PTRS certification.[78]

Respectfully submitted,



______________________________

Madelyn Moran

Dated: November 15, 2024

[78] Copy of suspension letter attached as Exhibit 10.

# EXHIBIT 1

CRA Charles River Associates

**Curriculum Vitae**

**Madelyn Moran**
Senior Associate
CHARLES RIVER ASSOCIATES
One South Wacker Drive
Chicago, IL 60611
Cell: (330) 419-1285
mmoran@crai.com | https://www.linkedin.com/in/madelynmoran/

## SUMMARY

Madelyn Moran is a Senior Associate in the Forensic Services practice at Charles River Associates with over eight years of experience in Forensics, Disputes and Investigations handling in-depth data analytics involving consumer class actions and data privacy matters. Madelyn leverages her ability to manage, manipulate, process, and analyze unstructured and structured data to provide customized solutions to data-based problems.

She has assisted clients across a breadth of industries including Financial Services, Consumer Marketing, and Lead Generation, Debt Collection, Insurance and Healthcare as well as many others. Through her experience, she has mastered the ability to communicate complex data-related issues and concepts in easily understandable, non-technical terms.

Madelyn's work in Consumer Class Actions includes handling and leading the analysis in TCPA, BIPA, CIPA, GDPR compliance and data privacy litigation.

## TESTIMONIAL EXPERIENCE

Tobajian v. The Allstate Corporation, No. 2:23-cv-00753-DMG-PD (C.D. Cal., Declaration filed May 21, 2024)

## EXPERIENCE

*TCPA Disputes*

- Prepare Affidavits, Declarations and Provide Testimony pertaining to analytics in TCPA cases
- Organize and compose reports with specific focus on call/dialer analytics
- Determine or verify class content, membership and/or size
- Review and evaluate opposing expert reports and opinions for development of rebuttal responses
- Upload, cleanse and summarize data received from clients
- Employ IMS datasets to designate potential class members as wireless or landline users
- Use third party vendors LexisNexis, Pacific East and TLO to conduct research on current and
- historical phone number associations
- Create transcripts of recorded call evidence and conduct transcript error analyses

*TCPA Compliance Verification*

- Review third-party dialer systems used for marketing/sales purposes
- Track porting of numbers and update Internal Do Not Call lists to ensure compliance with the TCPA
- Review historical call records and current call data to monitor compliance progress

*Compliance Review*

- Review documentation and reporting of higher education institution's graduate outcomes
- Review documentation and reporting of higher education institution's annual student reporting metrics (cost to attend, average debt, etc.)
- Review Policies related to transparent reporting for higher education institution
- Analyze reporting of statistics to national accrediting body
- Develop strategies to improve reporting procedures

*Investigative Due Diligence*

- Coordinate research results from public documents and electronic sources to perform comprehensive due diligence background investigations
- Use online databases including, but not limited to, Westlaw, Pacer, LexisNexis, BloombergLaw, National Student Clearinghouse
- Write reports with a focus on client needs including verification of expert witness credentials, individual and company asset investigations, board-member research, and fact witness investigations

## TCPA ANALYTICS & CASE MANAGEMENT EXPERIENCE

Madelyn has served as the case manager and/or analytics lead in support of an expert testifier in the following cases:

1. *Hogan v. Amazon.com, Inc.*, No. 21 C 3169 (N.D. Ill., Report issued June 13, 2024) (BIPA Class Action)
2. *Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc. and John Does 1-5*, No. 2:22-cv-10830 (E.D. Mich. Report filed May 24, 2024) (TCPA Class Action)
3. *Williams v. Pillpack, LLC.*, No: 3:19-cv-05282-DGE (W.D. Wash., Report filed February 26, 2024) (TCPA Class Action)
4. Sabatier v. American Health Reform Solutions, LLC. et al., No. 1 :23-cv-22203-RKA (S.D. Fla., Report filed January 9, 2024) (TCPA Class Action)
5. Bayles v. The Hertz Corporation, No. 1 :22-cv-01092-JRS-MKK (S.D. Ind., Report filed September 25, 2023) (TCPA Class Action)
6. Federal Trade Commission and Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. American Future Systems, Inc., et al., No. 2:20-cv-02266 (E.D. Pa., Report filed April 7, 2023.)
7. Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al., No. 7:22-cv-01052-TMC (S.D.S.C, Report filed February 10, 2023) (TCPA Class Action)
8. Doup v. Van Tuyl Group, LLC et al., No. 3:20-CV-02742-x (N.D. Tex., Report filed January 9,2023) (TCPA Class Action)
9. Nightingale v. National Grid USA Service Company, Inc. et al., No. 1:19-12341-NMG (D. Mass., Report filed October 2022) (TCPA Class Action)
10. Perrong v. Victory Phones, No. 2:20-cv-05317 (E.D. Pa., Report filed June 2022) (TCPA Class Action)
11. Gregory Katopodis, et al./MGM Springfield Mediation-JAMS Ref No. 1400019557 (FCRA)
12. Vance v. Microsoft Corporation, No. 2:20-cv-01082-JLR (W.D. Wash.) and Vance v. Amazon.com, Inc., No. 2:20-cv-01084-JLR (W.D. Wash., Report filed December 2021) (TCPA Class Action)
13. Walker v. CRME Financial Services, No. 3:20-cv-02218-BEN-JLB (S.D. Cal., Report filed December 2021) (TCPA Class Action)
14. Chinitz et al., v. Realogy Holdings Corp., No. 3:19-cv-03309-JD (N.D. Cal., Report filed May 2021) (TCPA Class Action)

15. Head v. Citibank, N.A., No.3:18-cv-08189-MHB (D. Ariz., Report filed August 2020) (TCPA Class Action)

## EDUCATION

**Indiana University, College of Arts & Science**s, Bloomington, IN
*Bachelor of Arts*, Economics May 2016
*Bachelor of Arts,* Political Science May 2016

## PROFESSIONAL HISTORY

**Charles River Associates** Chicago, IL January 2021 – Present
*Senior Associate – Forensic Services*

**Ankura Consulting** Chicago, IL August 2018 – January 2021
*Senior Associate – Analytics and Data Strategy / eDiscovery*

**Navigant Consulting** Chicago, IL August 2015 – August 2018
*Consultant – Global Legal Technology Solutions*

**Capita** Dublin, Ireland May 2014 – August 2014
*Intern – Finance & Investment Management*

# EXHIBIT 2

Produced in Native Format

# EXHIBIT 3

# Produced in Native Format

# EXHIBIT 4

# Produced in Native Format

# EXHIBIT 5

**From:** Andrew Watts
**To:** Moran, Madelyn
**Cc:** Martin, Jed; Daley, Peggy; Mathews, Lance
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question
**Date:** Wednesday, November 13, 2024 3:04:24 PM
**Attachments:** image001.png
image002.png
image003.png

---

No worries Madelyn, happy to help!

Yes your assumption is correct – in order to determine which list the wireless number came from, you'd need to use the new formatting. In the old format, if the number is wireless, the only list-related information you'd get is that it's a wireless number (the "4" code).

So there's no way to determine, using the old format, if a wireless number (flag "S", list "4") is on either the federal or state DNC. You would need to use the new format to be able to get that information – a wireless number that is not in one of the "no-wireless" states will be marked with the suppression flag "S", and a letter denoting which list(s) it's on.

For numbers that are in a no-wireless state, you'd just get the "W" suppression code and no specific list code. Given your need to differentiate between the lists, the new format is the best way to go.

Hope this helps for now,
Andrew

Andrew Watts
National Account Manager, LinkedIn: Click Here
YouTube: Click Here
*Website: PacificEast*

PacificEast

**THE UNITED STATES OF AMERICA HQ**
8625 SW Cascade Drive, Ste. 250, Beaverton, OR 97008
c 604.349.9890 f 604.504.7370
awatts@pacificeast.com; Set up a meeting directly on my calendar Here

---

**From:** Moran, Madelyn <MMoran@crai.com>
**Sent:** Wednesday, November 13, 2024 11:54 AM
**To:** Andrew Watts <awatts@pacificeast.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>; Mathews, Lance <LMathews@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Andrew—

Thank you for this information, its useful to know the differences between the old and new formats. And thank you for your patience with all my questions! I really appreciate it.

I do have a follow up for you—If I were to run a search using the old format and a number returned a DNC Code Flag of 'S' for Suppress, meaning the number is on a DNC, and the List Category was returned as a value of '4', how would I distinguish whether the number was on a state DNC, the Federal DNC or the DMA list? It appears to me that I would not be able to do that given this information, is that correct?

Ultimately, you'd have to run the new format to distinguish which list the number belongs to, am I understanding that right? For our search purposes, we would need to be able to differentiate between the lists.

Best,
Madelyn

**Madelyn Moran**
Senior Associate – Forensic Services

CRA Charles River Associates

One South Wacker Drive, Suite 3400
Chicago, IL 60606

+1-312-619-3346 direct
+1-330-419-1285 cell
mmoran@crai.com
www.crai.com

---

**From:** Andrew Watts <awatts@pacificeast.com>
**Sent:** Wednesday, November 13, 2024 1:21 PM
**To:** Moran, Madelyn <MMoran@crai.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>; Mathews, Lance <LMathews@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Hi Madelyn,

Yes I can help out here.

*First item I wanted to address is that we have a 'old' output file format, and a 'new' output file format.
-The output file I had sent you (and attached here) is the 'old' way, while the output referenced in the thread below is our 'new' output – I'll add that we can provide either output you wish (but our data team is actively requesting to send results back in the 'new' format for those running DNC)

That said, in the 'new' format, we no longer distinguish between wireless and non-wireless numbers, so the list code of "4" doesn't really have an equivalent in the new format.
-Wireless numbers are still marked as suppressed ("S"), but you receive a list code in the output file

(A, B, C, ..., G) like any other number. The only exception to this is if the wireless number is in one of the no-wireless states (Under the NOTES section in the thread below).

Essentially, '4 = Number matched on the wireless list' specifies which wireless numbers are listed on either/or State, Federal or DMA list (or all of the above as you may have a wireless number that flagged on all three lists).

*I'll add that DMA flagging relates to the 'Data & Marketing Association (DMA)' who manages the National Do Not Mail List for direct mail marketing.

Hope this helps!
If you have any q's in the meantime, please let me know.
Andrew

Andrew Watts
National Account Manager, LinkedIn: Click Here
YouTube: Click Here
*Website: PacificEast*

PacificEast

**THE UNITED STATES OF AMERICA HQ**
8625 SW Cascade Drive, Ste. 250, Beaverton, OR 97008
c 604.349.9890 f 604.504.7370
awatts@pacificeast.com; Set up a meeting directly on my calendar Here

---

**From:** Moran, Madelyn <MMoran@crai.com>
**Sent:** Wednesday, November 13, 2024 9:46 AM
**To:** Andrew Watts <awatts@pacificeast.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>; Mathews, Lance <LMathews@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Hey Andrew—

Thanks again for sending across these materials. I am reviewing the Output Layout and I note the below outputs for the field 'LIST CATEGORY CODE'. Can you explain to me what code 4, 'number matched on the wireless list' means?

0 = Number matched on a DNC state list
2 = DNC number removed at the compiler
3 = Number matched on the Federal DNC List
4 = Number matched on the wireless list
X = Unknown

Thank you,
Madelyn

**Madelyn Moran**
Senior Associate – Forensic Services

CRA Charles River Associates

One South Wacker Drive, Suite 3400
Chicago, IL 60606

+1-312-619-3346 direct
+1-330-419-1285 cell
mmoran@crai.com
www.crai.com

---

**From:** Andrew Watts <awatts@pacificeast.com>
**Sent:** Wednesday, November 6, 2024 10:41 AM
**To:** Moran, Madelyn <MMoran@crai.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Hi Madelyn,

Yes I can help out here around some of the details related to running DNC – see below as this is the info that we would provide back to you (I've highlighted the elements of the return file that you asked about in the thread below).

*Here are the details we return based on an input phone number:

- Phone number (unchanged from above)
- DNC Suppression code
    - Not checked (N)
    - No match (blank)
    - Invalid numbers (M)
    - Finds (S)
    - Federal DNC license violations (L)
    - Wireless numbers in no-wireless states (W) ***see note below***
- Phone number verification code (unchanged from above)
- DNC List code
    - Federal list (Flags A, D, E, or F)
    - State lists (Flags B, D, E, or G)
    - DMA list (Flags C, D, F or G)
- State – the 2-character state abbreviation of the state list a number is on (if applicable)
- Federal date – the date a number was added to the federal list (if applicable)
- State date – the date a number was added to the state list (if applicable)

*You'll see all of the above append to your original input data (same as we would do for all other

processes we run)
-I have attached the output file here as well as a reference to align fields to the codes above

NOTES:

- 'no-wireless' flag – Five states (AZ, LA, NJ, TX, WY) do not allow telemarketing calls to cell phone numbers at all, even with manual dialing. Previously, we flagged these numbers as suppressed but now flag them separately. If this restriction does not apply to you/your clients, you/your clients may be able to call them. We leave that decision up to you.
- The suppression code (above) is mostly the same, just with a new value (see values above as well).
- The DNC List code now breaks out which list a number is on, including detail about whether it appears on multiple lists (Federal and/or State and/or DMA)

*I'll add that all companies have permissible use to run DNC processes as it a proactive measure in maintain compliance with TCPA (Telephone Consumer Protection Act).

Further, in order to initially register Charles River, you would click the link here to get started - https://telemarketing.donotcall.gov/
*This site is provided by the Federal Trade Commission, and has all the info / resources you'll need.

**Once you've completed registration, you'll receive the following confirmation:

| | |
|---|---|
| Organization Name: | |
| Organization ID: | |
| Subscription Account Number (SAN): | |
| SAN Expiration: | |
| Today's Date: | |
| Payment Amount: | |
| Order Number: | |

We would only need the Org ID and SAN from this confirmation in order to run DNC on any input file you provide to us – hope all of this info helps!

[redacted]

[redacted]

[redacted]

Hope this info helps for now,
Thanks again Madelyn, I'll be back with you soon.
Andrew

Andrew Watts
National Account Manager, LinkedIn: Click Here
YouTube: Click Here
*Website: PacificEast*

PacificEast

**THE UNITED STATES OF AMERICA HQ**
8625 SW Cascade Drive, Ste. 250, Beaverton, OR 97008
c 604.349.9890 f 604.504.7370
awatts@pacificeast.com; Set up a meeting directly on my calendar Here

---

**From:** Moran, Madelyn <MMoran@crai.com>
**Sent:** Tuesday, November 5, 2024 4:20 PM
**To:** Andrew Watts <awatts@pacificeast.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Andrew—

Thank you for your time today and for sending all of this information over. This is really helpful. Could you please provide any written polices you have surrounding the DNC searching? Permissible uses, required credentials or otherwise?

Additionally, do both searches provide dates on which the telephone numbers were registered? Or is it a Y/N binary flag? Last, how does the search delineate between State and Federal Do Not Call lists? Could you provide the fields that are returned for both?

[redacted]

Thank you,
Madelyn

**Madelyn Moran**
Senior Associate – Forensic Services

CRA Charles River Associates

One South Wacker Drive, Suite 3400

Chicago, IL 60606

+1-312-619-3346 direct
+1-330-419-1285 cell
mmoran@crai.com
www.crai.com

---

**From:** Andrew Watts <awatts@pacificeast.com>
**Sent:** Tuesday, November 5, 2024 4:06 PM
**To:** Moran, Madelyn <MMoran@crai.com>
**Cc:** Martin, Jed <jmartin@crai.com>; Daley, Peggy <pdaley@crai.com>
**Subject:** RE: PacificEast | Charles River - Recap + Next Steps - re: October Billing Question

Hi Madelyn,

Nice speaking with both you and Jed today.
As a takeaway from our chat, I wanted to provide you with a quick recap of the three topics discussed, and the next steps.

**Recap:**
[redacted]

[redacted]

[redacted]

[redacted]

**Topic #2:**
-Do we provide DNC Verification / Flagging Services.
-Yes, we provide both Historical and Current DNC List Verification services – see below descriptions.

**Do Not Call (DNC) Historic** - Matches call lists against the available Federal, State and DMA Do-Not-Call Registry file at a particular point in time.

**Price: $0.07 per match, $150 minimum**

**Do Not Call (DNC) Current** - Do Not Call (DNC) is a service that gives telemarketers and users of telemarketing services the ability to"clean" or "scrub" their call lists against the available Federal and State Do-Not-Call Registry files. This service can only be provided to Customer if Customer acquires a license to the appropriate Do-Not-Call lists and provides Vendor with the resulting Subscription Account Number (SAN).

**Price: $0.07 per match, $150 minimum**

*I'll add that we would need both a SAN Number (Subscription Account Number) and an Organization ID

Next Steps: We can run this on it's own or add it to your existing template, so feel free to evaluate when/how you would like to utilize this.

[redacted]

[redacted]

Thanks again Madelyn,
Take care for now, I'll be back to you shortly re: topic #1.
Andrew

Andrew Watts
National Account Manager, LinkedIn: Click Here
YouTube: Click Here
*Website: PacificEast*

PacificEast

**THE UNITED STATES OF AMERICA HQ**

# EXHIBIT 6

# Produced in Native Format

# EXHIBIT 7

# Produced in Native Format

# EXHIBIT 8

# Produced in Native Format

# EXHIBIT 9

# Produced in Native Format

# EXHIBIT 10

tel-Lingua™

28255 Steeplechase Lane * Fair Oaks Ranch, TX 78015 * Voice (210) 380-0458 * Fax (210) 698-7150

August 22, 2023

Aaron Woolfson
TelSwitch Inc. d/b/a Tel-One Network Services
1937 Oak Park Blvd, Suite D
Pleasant Hill, CA 94523

Dear TelSwitch Inc.,

Tel-Lingua LLC has become aware that Telswitch Inc. has not achieved all of the steps necessary for PTRS certification with iConectiv.

We are suspending services to your organization.

Regards,

Andrew W Mangold
President and CEO

**This document contains confidential and proprietary information from Tel-Lingua LLC. Acceptance of this document signifies the intent of the recipient, and the company represented, to hold and protect this information to the same extent as would be afforded to the recipient's own proprietary and confidential information.**

# EXHIBIT B

CRA Charles River Associates

**Curriculum Vitae**

**Madelyn Moran**
Senior Associate
CHARLES RIVER ASSOCIATES
One South Wacker Drive
Chicago, IL 60611
Cell: (330) 419-1285
mmoran@crai.com | https://www.linkedin.com/in/madelynmoran/

## SUMMARY

Madelyn Moran is a Senior Associate in the Forensic Services practice at Charles River Associates with over eight years of experience in Forensics, Disputes and Investigations handling in-depth data analytics involving consumer class actions and data privacy matters. Madelyn leverages her ability to manage, manipulate, process, and analyze unstructured and structured data to provide customized solutions to data-based problems.

She has assisted clients across a breadth of industries including Financial Services, Consumer Marketing, and Lead Generation, Debt Collection, Insurance and Healthcare as well as many others. Through her experience, she has mastered the ability to communicate complex data-related issues and concepts in easily understandable, non-technical terms.

Madelyn's work in Consumer Class Actions includes handling and leading the analysis in TCPA, BIPA, CIPA, GDPR compliance and data privacy litigation.

## TESTIMONIAL EXPERIENCE

Tobajian v. The Allstate Corporation, No. 2:23-cv-00753-DMG-PD (C.D. Cal., Declaration filed May 21, 2024)

## EXPERIENCE

*TCPA Disputes*

- Prepare Affidavits, Declarations and Provide Testimony pertaining to analytics in TCPA cases
- Organize and compose reports with specific focus on call/dialer analytics
- Determine or verify class content, membership and/or size
- Review and evaluate opposing expert reports and opinions for development of rebuttal responses
- Upload, cleanse and summarize data received from clients
- Employ IMS datasets to designate potential class members as wireless or landline users
- Use third party vendors LexisNexis, Pacific East and TLO to conduct research on current and
- historical phone number associations
- Create transcripts of recorded call evidence and conduct transcript error analyses

*TCPA Compliance Verification*

- Review third-party dialer systems used for marketing/sales purposes
- Track porting of numbers and update Internal Do Not Call lists to ensure compliance with the TCPA
- Review historical call records and current call data to monitor compliance progress

*Compliance Review*

- Review documentation and reporting of higher education institution's graduate outcomes
- Review documentation and reporting of higher education institution's annual student reporting metrics (cost to attend, average debt, etc.)
- Review Policies related to transparent reporting for higher education institution
- Analyze reporting of statistics to national accrediting body
- Develop strategies to improve reporting procedures

*Investigative Due Diligence*

- Coordinate research results from public documents and electronic sources to perform comprehensive due diligence background investigations
- Use online databases including, but not limited to, Westlaw, Pacer, LexisNexis, BloombergLaw, National Student Clearinghouse
- Write reports with a focus on client needs including verification of expert witness credentials, individual and company asset investigations, board-member research, and fact witness investigations

## TCPA ANALYTICS & CASE MANAGEMENT EXPERIENCE

Madelyn has served as the case manager and/or analytics lead in support of an expert testifier in the following cases:

1. *Hogan v. Amazon.com, Inc.*, No. 21 C 3169 (N.D. Ill., Report issued June 13, 2024) (BIPA Class Action)
2. *Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc. and John Does 1-5*, No. 2:22-cv-10830 (E.D. Mich. Report filed May 24, 2024) (TCPA Class Action)
3. *Williams v. Pillpack, LLC.*, No: 3:19-cv-05282-DGE (W.D. Wash., Report filed February 26, 2024) (TCPA Class Action)
4. Sabatier v. American Health Reform Solutions, LLC. et al., No. 1 :23-cv-22203-RKA (S.D. Fla., Report filed January 9, 2024) (TCPA Class Action)
5. Bayles v. The Hertz Corporation, No. 1 :22-cv-01092-JRS-MKK (S.D. Ind., Report filed September 25, 2023) (TCPA Class Action)
6. Federal Trade Commission and Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. American Future Systems, Inc., et al., No. 2:20-cv-02266 (E.D. Pa., Report filed April 7, 2023.)
7. Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al., No. 7:22-cv-01052-TMC (S.D.S.C, Report filed February 10, 2023) (TCPA Class Action)
8. Doup v. Van Tuyl Group, LLC et al., No. 3:20-CV-02742-x (N.D. Tex., Report filed January 9,2023) (TCPA Class Action)
9. Nightingale v. National Grid USA Service Company, Inc. et al., No. 1:19-12341-NMG (D. Mass., Report filed October 2022) (TCPA Class Action)
10. Perrong v. Victory Phones, No. 2:20-cv-05317 (E.D. Pa., Report filed June 2022) (TCPA Class Action)
11. Gregory Katopodis, et al./MGM Springfield Mediation-JAMS Ref No. 1400019557 (FCRA)
12. Vance v. Microsoft Corporation, No. 2:20-cv-01082-JLR (W.D. Wash.) and Vance v. Amazon.com, Inc., No. 2:20-cv-01084-JLR (W.D. Wash., Report filed December 2021) (TCPA Class Action)
13. Walker v. CRME Financial Services, No. 3:20-cv-02218-BEN-JLB (S.D. Cal., Report filed December 2021) (TCPA Class Action)
14. Chinitz et al., v. Realogy Holdings Corp., No. 3:19-cv-03309-JD (N.D. Cal., Report filed May 2021) (TCPA Class Action)

15. Head v. Citibank, N.A., No.3:18-cv-08189-MHB (D. Ariz., Report filed August 2020) (TCPA Class Action)

## EDUCATION

**Indiana University, College of Arts & Science**s, Bloomington, IN
*Bachelor of Arts*, Economics May 2016
*Bachelor of Arts,* Political Science May 2016

## PROFESSIONAL HISTORY

**Charles River Associates** Chicago, IL January 2021 – Present
*Senior Associate – Forensic Services*

**Ankura Consulting** Chicago, IL August 2018 – January 2021
*Senior Associate – Analytics and Data Strategy / eDiscovery*

**Navigant Consulting** Chicago, IL August 2015 – August 2018
*Consultant – Global Legal Technology Solutions*

**Capita** Dublin, Ireland May 2014 – August 2014
*Intern – Finance & Investment Management*

TROUTMAN AMIN, LLP
400 Spectrum Center Drive, Suite 1550, Irvine CA 92618
troutman@troutmanamin.com

**PROOF OF SERVICE**

I am a citizen of the United States, over the age of 18 years, and not a party interested in the cause. I am an employee of Troutman Amin, LLP and my business address is 400 Spectrum Center Drive, Suite 1550, Irvine, California 92618. I served the documents on the following persons at the following addresses:

On November 15, 2024, I served the following document(s): **DEFENDANT VIA RENEWABLES, INC., F/K/A SPARK ENERGY, INC.'S REBUTTAL EXPERT DISCLOSURE**

The document(s) were served by the following means:

| | |
|---|---|
| **X** | **BY U.S. MAIL:** I enclosed the documents in a sealed envelope or package addressed to the person(s) set forth below, and placed the envelope for collection and mailing following our ordinary business practices, which are that on the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in Irvine, California, in a sealed envelope with postage fully prepaid. |
| **X** | **BY ELECTRONIC MAIL:** I caused such document(s) to be Electronically Mailed through the Troutman Amin, LLP electronic mail system for the above entitled case. |

| **SERVICE ADDRESS(ES)** | |
|---|---|
| **Attorneys for Plaintiff**<br>Christopher James Reichman<br>Justin Prato<br>PRATO & REICHMAN, APC<br>3675 Ruffin Road, Suite 220<br>San Diego, CA 92123<br>Email: chrisr@prato-reichman.com<br>Email: justinp@prato-reichman.com | Tel: 619-683-7971<br>Tel: 619-886-0252 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 15, 2024, at Irvine, California.

*/s/ Brittany A. Andres*
Brittany A. Andres